Paul H. Duvall (SBN 73699)
E-Mail: pduvall@kingballow.com
**KING & BALLOW**
6540 Lusk Blvd., Suite 250
San Diego, CA 92121
(858) 597-6000  Facsimile: (858) 597-6008

Mark L. Block (SBN 115457)
E-Mail: mblock@wargofrench.com
**WARGO & FRENCH LLP**
1888 Century Park East
Suite 1520
Los Angeles, CA 90067
(310) 853-6355  Facsimile: (310) 853-6333

Attorneys for Defendants Shep Pettibone
and Lexor Music, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VMG SALSOUL, LLC, a Delaware limited liability company,<br><br>    Plaintiff,<br><br>  vs.<br><br>MADONNA LOUISE CICCONE, professionally known as MADONNA, an individual; SHEP PETTIBONE, an individual; WB MUSIC CORPORATION, a Delaware corporation; BLUE DISQUE MUSIC COMPANY, INC., a corporation; WEBO GIRL PUBLISHING, INC.,  a California corporation; LEXOR MUSIC, INC., a New York corporation; and DOES 1 through 10, inclusive,<br><br>    Defendants. | Case No. CV 12-05967 BRO(CWx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS SHEP PETTIBONE AND LEXOR MUSIC, INC.'S AMENDED MOTION FOR SUMMARY JUDGMENT**<br><br>**Hearing Date: July 15, 2013**<br>**Time: 1:30 p.m.**<br>**Judge: Beverly Reid O'Connell**<br>**Courtroom: 14**<br><br>**Final Pretrial Conference: July 15, 2013**<br>**Jury Trial: August 13, 2013** |

# **TABLE OF CONTENTS**

I.    TABLE OF AUTHORITIES ...................................................................... iii

II.   INTRODUCTION................................................................................... 1

    A. The Parties ................................................................................. 2

    B. Request for Summary Judgment ................................................. 3

III.  STATEMENT OF FACTS ...................................................................... 4

IV.   APPLICABLE LEGAL STANDARD ..................................................... 11

V.    ARGUMENT ...................................................................................... 12

    A. Pettibone Cannot be Sued for Infringement of the "Love Break" Sound Recording Because he is a Co-Author ............................ 12

        (1) It is undisputed that Pettibone created the "Love Break" sound recording.......................................................................... 12

        (2) There exists no work-for-hire agreement concerning "Love Break" ....... 13

    B. The Newly Minted Claims Regarding the 12 Inch Club Mixes Should be Dismissed ................................................................. 15

    C. This Action is Barred by the Doctrine of Unclean Hands ............. 16

    D. The Alleged Copied Horn Hit or Stab In "Vogue" and the Alleged Copied Vocals, Congas, and Percussion in the "Vogue" 12-inch Remixes Are Not Subject to Copyright Protection .................... 18

        (1) The horn hit or stab in "Vogue" is not subject to copyright protection ...... 18

        (2) The congas and percussion in the "Vogue" 12-inch Remixes are also not subject to copyright protection ....... 20

    E. Plaintiff's Infringement Claim Fails for Lack of Evidence of Access ................ 20

    F. Pettibone Independently Created "Vogue," Including the Horn Hit .... 22

    G. Plaintiff Concedes the Alleged Copying, Which Pettibone Denies, Cannot be Heard by the Ordinary Observer, Meaning the Two Works are Not Substantially Similar ....... 25

H.  Plaintiff's Infringement Claims Also Must be Dismissed as *De Minimis* ............27

I.  In the Alternative, Plaintiff's Copyright Infringement Claim Should be Limited to the Statutory Three Year Period ....................................................29

VI.  CONCLUSION .......................................................................................30

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Ahanchian v. Xenon Pictures, Inc.*,
    403 Fed.Appx. 166 (9th Cir. 2010) ..................................................................12

*Armour v. Knowles,*
    512 F.3d 147, 152 (5th Cir.2007) ...................................................................21

*Art Attacks Ink, LLC v. MGA Entm't Inc.*,
    581 F.3d 1138 (9th Cir. 2009) ......................................................................21

*Baughman v. Walt Disney World Co.*,
    685 F.3d 1131, 1133 (9th Cir. 2012) ..............................................................25

*Benjamin v. Walt Disney Co.*,
    CV 05-2280GPS, 2007 WL 1655783 (C.D. Cal. June 5, 2007)................................29

*Bernal v. Paradigm Talent & Literary Agency*,
    788 F. Supp. 2d 1043 (C.D. Cal. 2010) ..........................................................21

*Bistro Executive, Inc. v. Rewards Network, Inc.*,
    CV 04-4640 CBM MCX, 2006 WL 6849825 , at *5 (C.D. Cal. July 19, 2006) .......25

*Bradbury v. Columbia Broad. Sys., Inc.*,
    287 F.2d 478, 485 (9th Cir. 1961) ..................................................................27

*BTE v. Bonnecaze*,
    43 F. Supp. 2d 619 (E.D. La. 1999)...................................................................6

*Cavalier v. Random House, Inc.*,
    297 F.3d 815 (9th Cir. 2002) ........................................................................27

*Community for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989)....................................................................................14

*Feist Pubs., Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340, 348–51, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991) .........................18

*Fisher v. Dees*,
  794 F.2d 432 (9th Cir. 1986) ............................................................ 26, 27

*Fuddruckers, Inc., v. Doc't B.R. Others, Inc.*,
  826 F.2d 837 (9th Cir.1987) ............................................................ 16

*Gaste v. Kaiserman*,
  863 F.2d 1061 (2d Cir.1988) ............................................................ 18

*Interstate Fire & Cas. Co. v. Underwriters at Lloyd's, London*,
  139 F.3d 1234 (9th Cir. 1998) ............................................................ 25

*Jason v. Fonda*,
  526 F.Supp. 774, 776-77 (C.D.Cal.1981) aff'd., 698 F.2d 966 (9th Cir.1982) .......... 22

*Jou v. Accurate Research*,
  73 Fed.Appx. 964 (9th Cir. 2003)........................................................ 14, 15

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ...................................... 12

*McDonald v. Multimedia Entertainment, Inc.*,
  No. 90 Civ. 6356(KC), 1991 WL 311921 (S.D.N.Y. July 19, 1991)........................ 19

*McIntosh v. N. California Universal Enterprises Co.*,
  670 F. Supp. 2d 1069, 1087 (E.D. Cal. 2009) .......................................... 26

*Merrill v. Paramount Pictures, Corp.*,
  No. CV 05–1150 SVW (MANx), 2005 WL 3955653 (C.D.Cal.2005)...................... 21

*Mitchell Eng'g v. City & Cnty. Of San Francisco*,
  C 08-04022 SI, 2010 WL 455290 (N.D. Cal. 2010) .................................... 17

*Murray Hill Publications, Inc. v. ABC Commc'ns, Inc.*,
  264 F.3d 622 (6th Cir. 2001) ............................................................ 11

*Newton v. Diamond*,
  204 F. Supp. 2d 1244 (C.D. Cal. 2002) ........................................... 12, 18-19

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION SUMMARY JUDGMENT

*Newton v. Diamond*,
  388 F.3d 1189 (9th Cir. 2004) ..........................................................26-28

*O'Brien v. City of Tacoma*,
  C04-5458FDB, 2005 WL 2045882, at *2 (W.D. Wash. Aug. 24, 2005)..................25

*Oddo v. Ries*,
  743 F.2d 630 (9th Cir. 1984) ..........................................................12-13

*Poindexter v. EMI Record Grp. Inc.*,
  11 CIV. 559 LTS JLC, 2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012)................19-20

*Polar Bear Productions, Inc. v. Timex Corp.*,
  384 F.3d 700 (9th Cir. 2004) ..........................................................29

*Premier Displays & Exhibits v. Cogswell*,
  SACV 09-354 JVS ANX, 2009 WL 8623588 (C.D. Cal. 2009)..............................17

*Reed Elsevier, Inc. v. Muchnick*,
  130 S. Ct. 1237(2010) ..........................................................11

*Republic Molding Corp. v. B.W. Photo Utilities*,
  319 F.2d 347 (9th Cir.1963) ..........................................................16

*Rice v. Fox Broad. Co.*,
  330 F.3d 1170 (9th Cir. 2003) ..........................................................22-23

*Richmond v. Weiner*,
  353 F.2d 41 (9th Cir. 1965) ..........................................................12

*Ringgold v. Black Entm't TV*,
  126 F.3d 70 (2d Cir. 1997) ..........................................................27

*Roderick v. Mazzetti & Associates, Inc.*,
  C 04-2436 MHP, 2006 WL 1883328, at *5 (N.D. Cal. July 7, 2006)........................25

*Rogers v. Koons*,
  960 F.2d 301 (2d Cir.1992) ..........................................................18

*Roley v. New World Pictures, Ltd.*,

19 F.3d 479 (9th Cir. 1994) .................................................................. 30

*Sanders v. Circle K. Corp.,*
    137 F.R.D. 292, 294 (D. Ariz. 1991) ..................................... 17

*Smith v. Jackson,*
    84 F.3d 1213 (9th Cir.1996) ................................................ 21

*Smith v. Jackson,*
    531 U.S. 1126, 121 S.Ct. 881, 148 L.Ed.2d 790 (2001) .......................... 21

*Stewart v. Wachowski,*
    574 F. Supp. 2d 1074, 1084 (C.D. Cal. 2005) ........................... 21

*Supermarket of Homes v. San Fernando Valley Bd.,*
    786 F.2d 1400 (9th Cir.1986) ................................................ 16

*Swirsky v. Carey,*
    376 F.3d 841 (9th Cir. 2004) ............................................... 19

*Tempo Music, Inc. v. Myers,*
    407 F.2d 503 (4th Cir.1969) ........................................... 16, 18

*Three Boys Music Corp. v. Bolton,*
    212 F.3d 477, 481 (9th Cir.2000) ........................................ 21

*TWA v. American Coupon Exchange,*
    913 F.2d 676 (9th Cir.1990) ................................................ 16

*United Nat. Ins. Co. v. Spectrum Worldwide, Inc.,*
    555 F.3d 772, 779-80 (9th Cir. 2009).................................... 25

*West Publ'g Co. v. Edward Thompson Co.,*
    169 F. 833 (E.D.N.Y. 1909) ................................................ 27

*Williams v. Kaag Mfrs., Inc.,*
    338 F.2d 949 (9th Cir. 1964) ............................................... 26

*Worth v. Selchow & Righter Co.,*
    827 F.2d 569, 570 n. 1 (9th Cir.1987) ..................................... 28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION SUMMARY JUDGMENT

*Yanez v. United States,*
  989 F.2d 323, 326 (9th Cir. 1993) ................................................................ 25


**FEDERAL RULES**

Fed. R. Civ. P. 56 ............................................................................... *infra*

**STATUTES**

17 U.S.C. § 101 ...........................................................................12-13, 25

17 U.S.C. § 102 ............................................................................... 12

17 U.S.C. § 201(a) .......................................................................... 13, 15

17 U.S.C. § 201(b) ............................................................................... 13

**TREATISES**

4 Nimmer on Copyright § 13.01[B] .................................................... 26

4 Nimmer on Copyright § 13.03[A] .................................................... 26

4 Nimmer on Copyright § 13.03[E] .................................................... 26

# I.   INTRODUCTION

This lawsuit was brought in bad faith, and with numerous allegations that Plaintiff now admits were absolutely, positively, knowingly false when alleged.  There is no dispute about that.   It is the work of a private equity-backed company desperate to recoup the cost of an investment, even if it means falsely and maliciously accusing their former colleague of copyright infringement on a 24 year old song on which the founder and CEO of the Plaintiff himself worked.  Not only should this action be dismissed, but Plaintiff must be made to pay all of the fees and costs it caused Defendants to incur for nothing.

In its Complaint, Plaintiff claims that Madonna's 1989 world famous recording "Vogue" (co-written by Defendants Shep Pettibone and Madonna) contains, throughout "Vogue," a millisecond-long, single chord horn sound, i.e., a "hit" or "stab," and "strings" from an obscure recording titled, "Ooh, I Love It (Love Break)" (hereinafter referred to as "Love Break"), which Plaintiff just recently purportedly acquired, and which Pettibone himself indisputably created.  Plaintiff alleges in its Complaint that the purported copying was "hidden" and "disguised" and could not be proven without electronic equipment supposedly invented in 2011 (alleged in a transparent attempt to avoid the statute of limitations, but, thereby, fatally conceding that any such alleged copying is *de minimis* and not actionable).   According to Plaintiff, the Defendants are liable for copyright infringement either for their role in the creation of "Vogue" some 24 years earlier, or for their exploitation of "Vogue" thereafter.

Plaintiff now admits that many of its allegations in the Complaint and discovery responses are false.  Plaintiff admits there are no "strings" from "Love Break" copied into "Vogue," and its musicologist, whose report was attached to the Complaint, admits he never advised Plaintiff that "strings" were copied.  Plaintiff also now states that the allegation that the copying had been deliberately hidden was not correct, and concedes that the new technology supposedly invented in 2011 – waveform analysis – has been around for decades.  Not only that, but Plaintiff's musicologist admitted that a wave form expert,

consulted by Plaintiff before the filing of the Complaint, could not prove any copying of the supposed less than quarter second horn hit from "Love Break," meaning that the allegation in the Complaint to the contrary was also knowingly false and sanctionable.  The wave form expert consulted by Defendants agrees, and has concluded that "Vogue" does not contain any copying of any horn stab from "Love Break."

Finally, as shown further below, all of Plaintiff's allegations in this action are false, and fail for the numerous reasons discussed below, but one fact is particularly unseemly and grounds for dismissal alone:  Plaintiff's founder and CEO, Curt Frasca, and its recent Senior Vice President, Tony Shimkin, are former colleagues of defendant Pettibone and worked with him on the very recordings of "Vogue" they now allege to be infringing. Shockingly, Frasca cannot deny that he and Shimkin, **and not Pettibone**, worked on post production club mixes of "Vogue" Plaintiff now contends contain additional infringing elements not found on the commercially released versions of "Vogue" on which Pettibone worked.   Accordingly, Plaintiff's plan to purchase "Love Break," in order to then turn around and sue Pettibone for copyright infringement, cannot proceed because the action is barred due to Plaintiff's unclean hands.

**<u>The Parties</u>**

Plaintiff, VMG Salsoul, LLC ("VMG" or "Plaintiff") is a limited liability company that owns the record catalog of Salsoul Records ("Salsoul"), and claims to be the owner of the "Love Break" sound recording at issue in this case.  Plaintiff is owned by Verse Music Group ("Verse"), which was founded in part by Curt Frasca ("Frasca"), Plaintiff's Chief Executive Officer.  Verse acquired Salsoul in July of 2010.  Frasca is a musical engineer by training, and worked with Pettibone for many years. Indeed, Frasca received credit and admits to having worked on a 12 inch, post production record containing three club mixes of "Vogue" alleged to contain samples from "Love Break," and admits to working on "Vogue" itself, meaning that, as described fully below, if "Vogue" infringes "Love Break," which it does not, Frasca is a co-infringer, has

unclean hands, and Plaintiff cannot pursue this action.  Frasca also could not rebut Pettibone's testimony that Pettibone did not work on the club mixes.  SOF ¶ 103.

Tony Shimkin ("Shimkin"), who has known Frasca since the two of them worked together with Pettibone almost twenty five years ago, was hired by Frasca as Senior Vice President of Production at Verse just before the filing of this action.  SOF ¶ 108. Shimkin was Pettibone's personal assistant for many years, and is also credited as an Editor on the club mixes of "Vogue," meaning that he too is liable as a co-infringer if "Love Break" is contained in "Vogue."  Shimkin has given interviews in which he has expressed anger and resentment toward Pettibone for supposedly not allowing him to have writer credit on certain other songs he claims to have worked on with Pettibone. Frasca terminated Shimkin approximately one month after he testified in his deposition in this action. SOF ¶ 109.

Defendant Pettibone is an award winning record producer and composer.  He is also formerly a well-known New York City radio personality who created and produced the sound recording of "Love Break" in 1982.  Pettibone is credited with writing the music of the "Vogue" musical composition and producing the sound recording embodying Madonna's performance of "Vogue."  Pettibone co-created and produced many other successful recordings by Madonna and others.  "Vogue" was commercially released in 1990 by Warner Bros. Records.

The remaining defendants are Madonna, WB Music Corporation (which owns and administers musical compositions and not sound recordings), Blue Disque Music Company, Inc. (currently non-existent), WEBO Girl Publishing, Inc., (Madonna's music publishing company), and Lexor Music, Inc. (Pettibone's music publishing company).

## Request for Summary Judgment

Defendants respectfully submit this Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.  As discussed in detail below, and in the attached Statement of Undisputed Facts, this copyright infringement case should be dismissed in its entirety for multiple

reasons:   (1) Pettibone is at minimum a co-author of "Love Break," who cannot be sued for infringement thereof; (2) Pettibone did not create the club mixes and, in all events, any claims concerning those club mixes are barred by unclean hands; (3) the alleged copied portions of "Love Break" are not subject to copyright protection as they lack originality and, therefore, are not copyrightable; (4) Plaintiff is unable to establish access; (5) Pettibone has proven independent creation; and (6) any such copying, which Pettibone denies, is *de minimis*.  In the alternative, Pettibone moves to limit Plaintiff's recoverable damages for infringement to the statutory three-year period because of the world wide dissemination of "Vogue," and because Plaintiff's predecessor, Salsoul, investigated the alleged infringement, but decided not to pursue any claim.

## STATEMENT OF FACTS

### Creation of "Ooh, I Love It (Love Break)"

In or around 1975, Vincent Montana, Jr. ("Montana") wrote a song for Salsoul entitled, "Chicago Bus Stop (Ooh, I Love It)" (referred to hereafter as "Chicago Bus Stop").  SOF ¶ 1.  "Chicago Bus Stop" was produced by Montana and recorded by the Salsoul Orchestra, and incorporated material from the group's prior song, "Love is the Message."  SOF ¶ 2.  In or around 1982, Pettibone was asked by Salsoul's owner, Ken Cayre, to use "Chicago Bus Stop" as inspiration to create a new composition and recording.  SOF ¶ 3.  In order to create what became "Love Break," the bass player and the drummer from "Love is the Message," who were members of the Salsoul Orchestra in 1982, performed and recorded bass and drums parts for use in "Love Break." SOF ¶ 5.  The recording contained essentially the same horn, string, bass, and drum parts from the group's earlier work on "Love is the Message."  SOF ¶ 6.  Indeed, when questioned about the horn sound in "Vogue" at his deposition, Shimkin himself identified it as being the same horn sound as in "Love Is The Message" – not "Love Break."  SOF ¶ 73.  Pettibone also composed original material and included a Rhodes, an organ, all of the percussion to the song, and lyrics from a vocal performance he independently created

for his radio work and recorded in or about 1980 of himself and others singing the lyrics "Love Break."  SOF ¶ 7. Pettibone has produced in this action the original reel to reel tape recording of this vocal performance he created in or about 1980.  SOF ¶ 8.

The new musical work that Pettibone created became known as the composition and the recording, "Ooh, I Love It (Love Break)" a/k/a "Love Break."  SOF ¶ 9.  There is no evidence in this record that the instrumental version of "Love Break," which was apparently created or released sometime thereafter, was released at any time prior to the creation of "Vogue," and no evidence that any of the Defendants ever had access to the instrumental version of "Love Break."  SOF ¶ 10.  This lack of access to the instrumental version of "Love Break" is important because Plaintiff's expert, Alexander Stewart, testified that it was absolutely only the quarter second horn hit from the instrumental version of "Love Break" that was copied in "Vogue,"[1] and he admitted there was no copying of "Love Break" if Defendants did not have access to the instrumental version of "Love Break" or the underlying creation files.  SOF ¶ 12. Pettibone did not have the instrumental version of "Love Break" or any of the creation materials from "Love Break."  SOF ¶ 13.

"Love Break" differs substantially from "Chicago Bus Stop."  SOF ¶ 19.  In fact, "Love Break" is much closer compositionally to "Love is the Message," with the "Love is the Message" bass player and drummer playing the rhythm used throughout "Love Break," and with the string alterations also heard throughout most of "Love Break." SOF ¶ 20.  These musical components structure the harmonic content of "Love Break," create the rhythm section, and establish the mood with the alternating string sounds and

---

[1] It bears mentioning that Stewart has completely altered his testimony from his report.  Stewart's report claimed that Pettibone supposedly copied a "double horn hit" from the "Love Break" instrumental and copied it into "Vogue."  SOF ¶ 15.  Stewart based that opinion on, supposedly, a reverse "cymbal" sound he heard in both "Love Break" and "Vogue."  SOF ¶ 16.  He now admits, however, that this backward "cymbal" sound is not in "Vogue," and his original report and conclusion was mistaken.  SOF ¶ 17.  He blames his mistake on not having the multi track master from "Vogue" at the time he reached his original conclusion.  SOF ¶ 18.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

their imitation on voice and vibes.  SOF ¶ 21.  This rhythm section is used as the base for a new rap composition by Pettibone, accompanied by additional percussion, organ, and Rhodes.  SOF ¶ 22.  The only two sections of thematic material from "Chicago Bus Stop" occupy a minor part of the total duration of the recording, two minutes and fifteen seconds of a seven-minute and twenty-five second piece.  SOF ¶ 23.  Importantly, Plaintiff's expert admits that Pettibone changed the horn chord from "Chicago Bus Stop" when creating "Love Break:"  the horn chord in "Love Break" does not have the "baritone saxophone" instrument present in "Chicago Bus Stop." SOF ¶ 24.

While Pettibone was credited only with "remixing" and "additional production" on the "Love Break" sound recording, by operation of copyright law Pettibone was an author (or co-author) and creator of "Love Break."  SOF ¶¶ 36, 4-5, 7.[2]  There was never a written agreement providing that "Love Break" was created by Pettibone as a work-for-hire, or a written assignment of Pettibone's copyright interest to Salsoul.  SOF ¶ 37.  Thus, as a matter of law, Pettibone owns (or at least co-owns) the copyright in the "Love Break" recording.  Salsoul never applied for a copyright registration for the musical composition or sound recording of "Love Break," and none exists.  SOF ¶ 39.

### Creation of "Vogue"

In or around 1989, Warner Brothers Records asked Pettibone to create a song for Madonna.  SOF ¶ 45.  This song became "Vogue." SOF ¶ 46.  The initial recording of "Vogue" was done by Pettibone and programmer, Alan Friedman ("Friedman"), at Friedman's residence.  SOF ¶ 47.  Friedman also worked directly with Pettibone at the Overdubbing sessions for "Vogue."  SOF ¶ 48.  Friedman's job as the programmer of "Vogue" was to run a sequencer, which is a computer program that is designed to trigger events out of various keyboards.  SOF ¶ 49.

---

[2] "Sound recordings and the underlying musical compositions are separate works with their own copyrights. … The sound recording is the aggregation of sounds captured in the recording while the song or tangible medium of expression embodied in the recording is the musical composition." *BTE v. Bonnecaze*, 43 F. Supp. 2d 619, 627-28 (E.D. La. 1999) (internal citations omitted).

"Vogue" was commercially released on Madonna's "I'm Breathless" album, and later as a single in 1990.  SOF ¶ 51.  The only allegation of copying in this case with respect to the single and album version of "Vogue" is that it supposedly contains a single-chord horn stab from "Love Break."  SOF ¶ 52.  It does not.  Pettibone created the horn sound using several devices, including a "proteus emulator," which has pre-recorded, factory installed, live sounds on it,[3] and an Akai S1000 processor, which integrated individual synthetic instrumental sounds, combined with other studio equipment and techniques. SOF ¶ 54.  Pettibone has located and produced in this action the floppy disk that has the individual instrument sounds that he used to make up the horn chord and other sounds heard in "Vogue," including the drums.  SOF ¶ 55.

## Creation of the "Vogue" 12 Inch Post Production Club Mixes

Frasca and Shimkin are credited as working together on three "Vogue" club mixes or extended versions created after the initial "Vogue" recording.  SOF ¶ 74.  These post production extended mixes were created on the evening after the original Vogue was completed, but not released until after the original recording, on a separate 12 inch vinyl record and were titled "Vogue (12 inch Version)," "Vogue (Bette Davis Dub)," and "Vogue (Strike-a-Pose Dub)" (referred to hereafter as the "12-inch Club Mixes").  SOF ¶ 75.  At this time, Shimkin was working at Soundworks, the studio where the original version of "Vogue" was mixed.  SOF ¶ 76.  Shimkin was credited on the 12-inch Club Mixes as the Editor.  SOF ¶ 77.  Frasca worked alongside Shimkin as an assistant engineer on the 12-inch Club Mixes, and is credited as Assistant Engineer.  SOF ¶ 85.

Pettibone has testified he was not present in the studio during the creation of the 12 inch Club Mixes. SOF ¶ 88. Instead, after he completed original production of

---

[3] While Shimkin has testified in deposition that Pettibone told Friedman to sample the "Love Break" horn stabs for use in "Vogue," Friedman, who was with Pettibone during the entire recording process, and specifically for the recording of the horn sound in "Vogue," testified that he was never asked to sample "Love Break," and has no knowledge of it or any other song being copied into "Vogue."  SOF ¶70.

"Vogue," Pettibone left Frasca and Shimkin behind at the studio, where they worked with others to create the 12 inch Club Mixes. SOF ¶ 89. Frasca was specifically asked about Pettibone's testimony in this regard, and did not deny it; instead, he claimed he had "no memory of how this [the 12 inch Club Mixes] was created." SOF ¶ 90.

Frasca was clear, however, that he worked on the 12 inch Club Mixes. SOF ¶ 86. Moreover, Frasca testified that he believed, as early as 1990 when he was working on the 12-inch Club Mixes, that "Vogue" and the 12-inch Club Mixes contained a sample of the horns from the "Love Break" sound recording. SOF ¶ 86. With respect to the 12-inch Club Mixes, on which he admittedly worked, Frasca testified that he believes that each contains samples from the "Love Break" sound recording beyond the horn "stab," including congas, percussion, and vocals that say "Love Break."[4] SOF ¶ 91.

Frasca further testified that there are two more versions of "Vogue" that allegedly contain samples from "Love Break." SOF ¶ 98. Yet, there is no evidence in this record that these two remixes titled, "Vogue (Shep's On The Fly)" and "Vogue (The Shep Pettibone Integral Mix)" were created or authorized by any of the Defendants. SOF ¶ 99. Moreover, there is no evidence in this record of these two remixes ever having been played on the radio or commercially released. SOF ¶ 100.

Pettibone, Shimkin, and Frasca were more than just co-workers: Shimkin lived with Pettibone rent free in New York City for almost five years and engaged in a romantic relationship with Pettibone that Pettibone ultimately ended; Frasca and Shimkin worked for Pettibone for many years and the three of them vacationed together in the Caribbean and enjoyed frequent getaways to Pettibone's home in the Poconos; and both Shimkin and Frasca credit Pettibone for helping them establish their music

---

[4] Pettibone has testified that, in creating Vogue, he thought about taking his original reel to reel tape of his own vocal performance of the chant "Love Break," recorded by him in his parent's house in 1980 (years prior to ever being asked to create "Love Break"), and using it in "Vogue," so he put his own personal chant from his original recording on the "Vogue" multi-track. SOF ¶ 92. That chant was not, however, used ultimately in "Vogue." SOF ¶ 93. Frasca apparently found it on the multi track when he was creating the 12 inch post production remixes, and used it.

production careers.  SOF ¶ 97.  Now, however, they have the unmitigated gall to team up to sue Pettibone, alleging that he committed copyright infringement of: (i) a recording and composition he created; (ii) in a recording, "Vogue," that Shimkin and Frasca are credited themselves with co-creating.  It is not a coincidence that Frasca hired Shimkin as Vice-President of Music Production at Verse in August, 2011, just eleven months before the filing of this Complaint.  SOF ¶ 108.[5]

**Salsoul investigates "Vogue's" possible sampling of "Love Break"**

Several years prior to Verse's acquisition of Salsoul, Salsoul thought that "Vogue" might contain a sample of the "Love Break" sound recording.  SOF ¶ 104.  Salsoul investigated the matter, even bringing in the drummer on "Love Break" to listen to "Vogue" to determine whether it contained samples from "Love Break."  SOF ¶ 105.  The drummer did not believe that there were samples from "Love Break" in "Vogue," and further was unable to identify any portion of "Love Break" in "Vogue" at all.  SOF ¶ 106.  Salsoul decided not to pursue any claim because it determined that there was no use of "Love Break" in "Vogue," or, if there were any at all, it was minimal and insufficient to support an infringement claim.  SOF ¶ 107.

Prior to finalizing the sale of Salsoul to Verse in 2010, Frasca asked Salsoul executive, Glen Larusso, why Salsoul had not pursued an infringement claim for the supposed use of a sample of "Love Break" in "Vogue."  SOF ¶ 110.  Larusso responded that Salsoul was aware of the potential claim, but chose not to pursue it because any supposed use was minimal.  SOF ¶ 111.  Larusso further told Frasca that "Vogue" was twenty years old, so the statute of limitations would make any claim not worth pursuing.  SOF ¶ 112.  Frasca does not deny this conversation with Larusso took place.  SOF ¶ 113.

**Plaintiff's Complaint for copyright infringement of "Love Break"**

---

[5] Defendants just recently learned that Frasca fired Shimkin shortly after he testified in his deposition in this case.  SOF ¶ 109.

Plaintiff's Complaint, brought *twenty-two years* after the release of the supposedly infringing "Vogue," alleges that portions of "Vogue" (horns and strings) are intentionally sampled from the "Love Break" sound recording throughout. SOF ¶ 115. Yet, as mentioned above, Plaintiff's expert not only never mentioned the copying of "strings" anywhere in his report, but testified he never advised Plaintiff that strings were copied.   SOF ¶ 115.   The Complaint also asserts the copied portions of the "Love Break" sound recording were "deliberately hidden," and "disguised," could not be heard by an ordinary observer, and were only detected when [Plaintiff] specifically looked for the sample, with the technology first available to it in 2011." SOF ¶ 117. While Plaintiff now attempts to offer contrary evidence, its expert admitted in deposition that a wave form expert he advised Plaintiff to retain prior to the filing of the Complaint was *unable* to prove copying occurred.  SOF ¶ 120.  Defendants have retained an expert in sound wave and spectral testing who also concluded that the less than quarter second horn hit in "Vogue" is *not* copied from "Love Break."  SOF ¶ 121.

Finally, the Complaint attaches the composition copyright registration for the work "Chicago Bus Stop (Ooh, I Love It)," which was written by Vincent Montana and recorded by the Salsoul Orchestra in 1975.  SOF ¶ 124.  The words, "Love Break," are not found on the registration, contrary to the false assertion in Plaintiff's Complaint. SOF ¶ 103.  The attached copyright registration is dated May 1976, while "Love Break" was admittedly not created until 1982.   SOF ¶ 125.   Plaintiff also attaches to the Complaint an irrelevant November 1975 application (not a registration) for a sound recording titled "The Sasloul [sic] Orchestra."   SOF ¶ 127[6].   Frasca and Plaintiff's expert both testified that it is the less than quarter second horn hit from "Love Break," and not "Chicago Bus Stop" that was supposedly copied into "Vogue."  SOF ¶ 128.

---

[6] Plaintiff makes no claim regarding the "Love Break" musical composition and therefore, only the sound recording is at issue in this action.  SOF ¶ 130.

While, as a result, Plaintiff does not have a copyright registration for the allegedly infringed work at issue in this action,[7] Pettibone is not seeking dismissal for this registration defect in this motion.[8]   Plaintiff has brought an objectively unreasonable action in bad faith, based in allegations it knew were false when made, against the CEO and founder's former colleague, alleging infringement by a recording on which the CEO and founder himself worked, based on a song and recording for which Defendant Pettibone is an author, in the appalling attempt to try to recover a portion of the money it spent to acquire the catalog of music supposedly containing the infringed song.   SOF ¶ 114.   Mr. Pettibone, who has been out of the music business for many years, has been greatly damaged by this disgusting behavior:   he has been required to incur enormous legal fees and costs to defend himself, and, under certain circumstances, has a duty to indemnify certain of the other defendants for their fees and costs.   A dismissal without prejudice, therefore, does not make Mr. Pettibone whole by any stretch of the imagination for the wrongdoing of the Plaintiff.   The only way Mr. Pettibone and Defendants can be made whole is by a dismissal, with prejudice, on the merits, and the awarding to them of their fees and costs under the Copyright Act.   That is what Defendants are seeking.

## II.   APPLICABLE LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

---

[7]To the extent Plaintiff claims "Love Break" is a derivative work of "Chicago Bus Stop," and thus does not need to register the work, that argument fails.   *See Murray Hill Publ'ns, Inc. v. ABC Commc'ns, Inc.*, 264 F.3d 622, 633 (6th Cir. 2001) (plaintiff barred from bringing action for copyright infringement of derivative song where plaintiff only formally registered the original song and failed to register the derivative song).

[8]The United States Supreme Court has recently held that a copyright registration is not a "jurisdictional" requirement in a copyright infringement action, meaning this Court has jurisdiction to rule on the merits of this motion even though Plaintiff does not have a copyright registration on file. *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1246-49 (2010).

judgment as a matter of law." Fed. R. Civ. P. 56(a) - (c); *see Newton v. Diamond*, 204 F. Supp. 2d 1244, 1247 (C.D. Cal. 2002);  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L. Ed. 2d 538 (1986).

## III.   ARGUMENT

### A. Pettibone cannot be sued for infringement of the "Love Break" sound recording because he is a co-author

A co-author of a joint work cannot be liable to another co-author for infringement of the copyright.  *Oddo v. Ries*, 743 F.2d 630, 632-33 (9th Cir. 1984).  A joint work is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C. § 101. The question of whether a defendant is a co-author of the copyright in question should be decided first because, should it be determined that the defendant is a co-author, the infringement action may be ended without further analysis since a copyright owner cannot infringe against its own copyright.  *See Richmond v. Weiner*, 353 F.2d 41 (9th Cir. 1965).  Furthermore, the question of co-authorship is proper for summary judgment where undisputed facts demonstrate that the defendant is a co-author.  *See Ahanchian v. Xenon Pictures, Inc.*, 403 Fed. Appx. 166 (9th Cir. 2010).

### (1) It is undisputed that Pettibone created the "Love Break" sound recording

As a general rule, the author is the party who creates the work, or who translates an idea into a fixed, tangible expression entitled to copyright protection.  17 U.S.C. § 102.  Here, it is undisputed that Pettibone was asked by Salsoul's owner to create the sound recording of "Love Break."  SOF ¶ 3.  Using Salsoul's "Chicago Bus Stop" as inspiration, Pettibone added multiple elements to it, including different bass and drum parts, enhancement of the strings, and original material played by a Rhodes, an organ, and all of the percussion instruments. SOF ¶ 5-7. Pettibone also changed the horn chord from "Bus Stop" by removing the baritone sax, as Plaintiff's expert concedes.  SOF ¶ 24. Lastly, Pettibone contributed a vocal performance, or "rap", made by Pettibone and other singers, the lyrics of "Love Break."  SOF ¶ 22.  The "Love Break" sound

recording is an entirely new work created by Pettibone.  SOF ¶ 4, 7, 9.  By operation of copyright law, Pettibone is an author of the "Love Break" sound recording because he is the creator.  17 U.S.C. § 201(a) ("copyright ownership vests initially in the author or authors of the work").  An action against him for infringement of any portion of the sound recording cannot, therefore, stand.  *See Oddo*, 743 F.2d at 632-33.[9]

### (2)  <u>There exists no work-for-hire agreement concerning "Love Break"</u>

Salsoul could only be the owner of the "Love Break" sound recording if it entered into a written work-for-hire agreement with Pettibone. The Copyright Act permits works to be made "for hire" only in very narrow circumstances:  (1) a work prepared by an *employee* within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties *expressly agree in a written instrument signed by them that the work shall be considered a work made for hire*.  17 U.S.C. § 101.  If the work is for hire, the employer or other person for whom the work is prepared is considered the author and owns the copyright, unless there is a written agreement to the contrary.  *Id*. § 201(b).

Sound recordings are not included as one of the enumerated categories under works specially commissioned qualifying as works for hire.  *Id.* § 101.  Even if they were, there was no written agreement between Pettibone and Salsoul expressly stating

---

[9]  Indeed, Plaintiff's expert conceded that, so long as Pettibone received permission to create "Love Break," and there exists no work for hire agreement, Pettibone should be considered the owner of the portions of "Love Break" he himself created or altered from "Bus Stop."  SOF ¶ 42.  He also admitted that there were more substantial changes between "Bus Stop" and "Love Break" than there were between two other songs in another lawsuit in which he issued a report concluding that the creator of new version of another song should be considered the writer of a separate copyrightable work.  SOF ¶ 43.

that the "Love Break" sound recording was a work for hire.[10] SOF ¶ 37.  Accordingly, "Love Break" could only be a work for hire if Pettibone was an employee of Salsoul. However, he was not an employee but an independent contractor, as described below.

In circumstances similar to these, the Ninth Circuit held that the plaintiff could not establish the copyrights in question were works made for hire because the creators were independent contractors, not employees.  *Jou v. Accurate Research*, 73 Fed. Appx. 964 (9th Cir. 2003).  In its analysis, the Ninth Circuit applied the factors dictated by the U.S. Supreme Court in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), and concluded that the creators of the work were not employees of the plaintiff because:  they were highly-skilled; the plaintiff did not retain the right to control the manner or means by which the creators performed their work; the creators often worked on their own equipment even though the plaintiff provided equipment; the creators were hired for short periods of time and for discrete projects; and the plaintiff did not provide any employee benefits or withhold any taxes from the creators' pay.  *Id.* at 966.

Likewise, in the present case, Pettibone was a highly skilled producer who was asked by Salsoul to create a specific project – the "Love Break" sound recording.  SOF ¶ 3.   No oral or written employment agreement was ever made, and no terms of employment were ever discussed.  SOF ¶ 37.  Plaintiff has no evidence to the contrary. Additionally, unlike an employee, Pettibone only went to Salsoul's offices perhaps once a month, and, as the producer, was the creative force behind "Love Break."  SOF ¶¶ 4, 38.  Salsoul asked Pettibone to work on other projects prior to "Love Break," but had no right to assign additional projects to Pettibone; he was simply asked each time whether he would like to complete a specific project.  SOF ¶ 40.  Lastly, Pettibone did no further work for Salsoul after "Love Break" and has not spoken to owner Ken Cayre since. SOF ¶ 41.  It is clear from these undisputed facts that Pettibone was an independent

---

[10]  Copyright in a work may be assigned through a written agreement if the work was not created as a work for hire; however, there was no written assignment from Pettibone to Salsoul, and Plaintiff has not alleged there was.

contractor of Salsoul Records, and therefore, the "Love Break" sound recording was not a work made for hire. *Jou*, 73 Fed. Appx. at 964. Pettibone is, at least, therefore, a co-owner of the "Love Break" sound recording and, for the same reasons, a co-owner of the "Love Break" musical composition, which he created as embodied in the sound recording. 17 U.S.C. §201(a).

### B. The newly minted claims regarding the 12 inch club mixes should be dismissed

Nine months after filing this action, Plaintiff produced an obscure 12 inch vinyl record containing the little distributed 12 inch Club Mixes, and claimed that they contained infringing portions of "Love Break" beyond the horn hit alleged in the Complaint. SOF ¶ 91. The 12 inch Club Mixes were not mentioned in the Complaint, and no Amended Complaint was filed to assert infringement based upon anything in the 12 inch Club Mixes. Any claims concerning the 12 inch Club Mixes should be disregarded on this basis alone.

If the Court considers any infringement claim based on the 12 inch Club Mixes, the Court should dismiss such claim because the undisputed evidence in this record is that Pettibone did not even work on those versions of "Vogue." SOF ¶¶ 88-90. As discussed fully above, Pettibone testified that he left Messrs. Frasca and Shimkin at the studio after he completed his work on the primary version of "Vogue," and Frasca, along with others, created the extended 12 inch Club Mixes. SOF ¶¶ 88-89. Frasca, who was testifying at the time as the 30(b)(6) witness of the Plaintiff, testified that he could not dispute Pettibone's version of those events. SOF ¶ 90.

Plaintiff also alleges that two additional remixes of "Vogue" allegedly infringe "Love Break": "Vogue (Shep's On the Fly)" and "Vogue (The Shep Pettibone Integral Mix)", neither of which appear in Plaintiff's Complaint. SOF ¶¶ 98-102. Pettibone was also not involved in the creation of these works and Plaintiff has no proof to the contrary. SOF ¶¶ 99-100. In fact, Frasca admitted that it was possible none of the Defendants had anything to do with the creation of these works and that they were

potentially created by unauthorized third parties.  SOF ¶ 101.  Frasca further admitted that he had no evidence regarding whether they were ever played on the radio or otherwise exploited by any of the Defendants, or whether they generated any income. SOF ¶ 102.  There is no evidence in this record that these works were created by Pettibone, and no evidence that they have ever been exploited, sold, or otherwise distributed by any of the Defendants.  SOF ¶¶ 99-102.

### C. This Action is barred by the doctrine of Unclean Hands

The defense of unclean hands applies in copyright infringement cases to prevent a plaintiff from obtaining relief both in law and in equity.  *Supermarket of Homes v. San Fernando Valley Bd.,* 786 F.2d 1400, 1408 (9th Cir. 1986).  Whether to apply the defense of unclean hands is within the Court's sound discretion.  *TWA v. American Coupon Exchange,* 913 F.2d 676, 695 (9th Cir. 1990). The defense will apply to bar recovery where the plaintiff's wrongful act relates to the subject matter of the plaintiff's claims.  *Fuddruckers, Inc., v. Doc't B.R. Others, Inc.,* 826 F.2d 837, 847 (9th Cir. 1987). In applying the doctrine, "[w]hat is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendants." *Republic Molding Corp. v. B.W. Photo Utilities,* 319 F.2d 347, 349 (9th Cir. 1963).

In *Supermarket,* the court awarded summary judgment and damages to the defendants on their copyright counterclaim. 786 F.2d at 1410.  The plaintiff argued the defense of unclean hands prevented the defendants from recovering damages.  *Id.* at 1408.  The Ninth Circuit cited a Fourth Circuit case holding the defense of unclean hands applies in an action at law.  *Id.* (citing *Tempo Music, Inc. v. Myers,* 407 F.2d 503, 507 & n.8 (4th Cir. 1969)).  In *Tempo,* the Fourth Circuit held it would be inequitable for the party to recover damages **when the party's action led, in part, to the infringement**. *Id.*  Plaintiff alleges copyright infringement with unclean hands because

Plaintiff's founder and CEO, as well as one of its officers, contributed to the allegedly infringing works.

Plaintiff produced at Frasca's deposition, for the very first time, the 12-inch Club Mixes on which its founder and CEO worked along with its Senior Vice President.  SOF ¶¶ 12, 15, 25. Pettibone, however, did not work on the 12 inch Club Mixes.   As discussed fully above, Pettibone testified he left Messrs. Frasca and Shimkin at the studio after he completed his work on the original version of "Vogue," and Frasca, along with others, created the extended 12 inch Club Mixes. SOF ¶¶ 88-89. Frasca, who was testifying at the time as the 30(b)(6) witness of the Plaintiff, admitted he could not dispute Pettibone's version of those events.  SOF ¶ 90.[11]   Frasca has also testified he was an engineer on the original recording of "Vogue."  SOF ¶ 85.

In addition to Frasca's undisputed testimony, Shimkin explained at his deposition, "I often took part in programming or the recording process, the mixing process."  SOF ¶ 78. When asked whether it would be fair to say that Shimkin was *not* a writer or involved in the production or creation of "Vogue," Shimkin replied, "No."  SOF ¶ 79. Instead, Shimkin went on to insist, "I was together with [Pettibone] in the writing of ["Vogue,"] so to speak, in the production of ["Vogue,"] the recording of ["Vogue,"] and directing of programmers and engineers." SOF ¶ 80. Shimkin further insisted that Pettibone "included [him] very much so in every respect of the process." SOF ¶ 81.

 Shimkin testified that he would "often **sample vocal** phrases from within the songs, "so when we created extended versions, I would then play these vocal samples in a rhythmic manner for certain portions of the extended remix, in the dub and in other versions."  SOF ¶ 82.  Shimkin would also "act as engineer in creating some of the elements of arrangements of the mix, so to speak, muting certain sections, adding delay;

---

[11] Because Frasca was testifying as a 30(b)(6) witness, Plaintiff cannot put on any contrary evidence.  *Sanders v. Circle K Corp.*, 137 F.R.D. 292, 294 (D. Ariz. 1991); *Mitchell Eng'g v. San Francisco*, C 08-04022 SI, 2010 WL 455290 (N.D. Cal. 2010); *Premier Displays & Exhibits v. Cogswell*, SACV 09-354 JVS ANX, 2009 WL 8623588 (C.D. Cal. 2009).

creative things that you would do in the process of mixing a record, and edit the final product."  SOF ¶ 83.  Shimkin specifically acknowledged the "Vogue (12" version)," and "Vogue (Bette Davis Dub)," and "maybe another dub," as remixes on which he personally worked.  SOF ¶ 84.  In sum, Plaintiff brings this action for copyright infringement with unclean hands, and it must be dismissed.  *See Tempo Music*, 407 F.2d at 507.

### D. The alleged copied horn hit or stab in "Vogue" and the alleged copied vocals, congas, and percussion in the "Vogue" 12-inch Club Mixes are not subject to copyright protection

### (1) The horn hit or stab in "Vogue" is not subject to copyright protection

The core claim at the heart of the Complaint is that a single chord horn sound from an obscure instrumental version of "Love Break," appears in "Vogue."  SOF ¶¶ 12, 15, 25.   The term "horn hit" or "horn stab" is often used to refer to this kind of short, percussive use of a chord, an effect commonly used in funk, up-tempo soul, and disco.  SOF ¶ 116.   The allegedly copied horn hits from "Love Break" are not subject to copyright protection because they are too trivial and are not sufficiently original.

"The protectability of elements of a copyrighted work is a question of law for the court."  *Newton*, 204 F. Supp. 2d at 1253-54.  Not every element of a song is *per se* protected.  *Id.* (citing *Rogers v. Koons,* 960 F.2d 301, 307 (2d Cir.1992)). "Copyright protection extends only to those components of the work that are original and non-trivial."  *Id.* (citing *Feist*, 499 U.S. at 348–51).  "In assessing originality, courts must be 'mindful of the limited number of notes and chords available to composers and the resulting fact that common themes frequently appear in various compositions, especially in popular music.'"  *Id.* (quoting *Gaste v. Kaiserman,* 863 F.2d 1061, 1068 (2d Cir.1988)).

It is undisputed the alleged copied horn hits in "Vogue" consist solely of a single chord, or stab.[12]  SOF ¶¶ 25, 28.  Thus, as noted by the Court in its January 29, 2013 Order, "at its core, Plaintiff's allegation of copyright infringement centers on a *single* chord."  Dkt. No. 29 at 5.  Notably, as further acknowledged by the Court, "a single chord is 'too small a unit to attract copyright protection.'"  *Id.* (quoting *Swirsky v. Carey*, 376 F.3d 841, 851 (9th Cir. 2004)).

In *Newton v. Diamond*, the court held even a "three-note sequence (C—D-flat—C) with one background note (C), segregated from the entire piece, cannot be protected, as it is not original as a matter of law."  204 F. Supp. 2d at 1253-54.  Here, the alleged copied portion of "Love Break" is even *less* than a three note sequence and consists of only a <u>single</u> chord or "hit."  SOF ¶¶ 28-31.  Thus, the alleged copied horn "hit" is not original and too trivial to warrant copyright protection and, therefore, Plaintiff's copyright infringement claim fails <u>as a matter of law</u>.  *See also Poindexter v. EMI Record Grp. Inc.*, 11 CIV. 559 LTS JLC, 2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012) (single pickup note played on a piano that sounds for about two seconds and repeated on a loop is not subject to copyright protection); *McDonald v. Multimedia Ent'mt, Inc.*, No. 90 Civ. 6356(KC), 1991 WL 311921, at *4 (S.D.N.Y. July 19, 1991) ("it is extremely doubtful that [a] single note and its placement in the composition is copyrightable").

In addition, the single horn hit has been frequently used in prior works that pre-date "Chicago Bus Stop" and "Love Break."  SOF ¶ 131.  The most prominent examples are in "Love is the Message" (1972), "T.S.O.P" (1974), "Ferry Avenue" (1975), "Get Down with the Philly Sound" (1975), and there are others.[13]  Indeed, many of these

---

[12] As noted above, Plaintiff's expert, Dr. Stewart, has recanted his prior position that the alleged sample consists of a horn hit sounded once followed by a double horn hit. SOF ¶¶ 25-26.

[13] "I'm On Your Side" (1976), "Plenty Good Lovin'" (1976), "Sexy" (1975), "Give the People What They Want" (1975), "Living for the Weekend" (1975), "Get the Cream Off the Top" (1975), "Girl You Need a Change of Mind" (1973), "I'll Always Love My Mama" (1973), "I'm a Free Man" (1975), "The More I Get, the More I Want" (1977), "I Don't Love You Anymore" (1977), "Get Up, Get Down, Get Funk, Get

recordings were created by the same group, MFSB, that recorded "Chicago Bus Stop" when they later performed under the name Salsoul Orchestra. SOF ¶¶ 2, 131.  Shimkin himself, at his deposition, testified that the horns in "Love is the Message" sound identical to those in "Love Break," and in "Vogue."   SOF ¶ 73. The horn sound in "Love Is The Message" appears at 5:56-5:58, and in "Love Break" at 3:36-3:40. SOF ¶ 131.  Shimkin was correct: the original horn sound does not lie with "Love Break." This prior art also requires the conclusion that the single chord horn in "Vogue" is not original, and not subject to copyright protection.

**(2)  The congas and percussion in the "Vogue" 12-inch Club Mixes are also not subject to copyright protection**

Any claims concerning the 12-inch Club Mixes, as discussed above, should be dismissed.  If the Court considers any claim concerning the 12 inch Club Mixes, the congas and percussion are likewise not subject to copyright protection.   The conga pattern heard on the 12-inch Club Mixes is the most prevalent pattern on conga, played for mambos, sones, guarachas, generally in salsa pieces, and also widely used in rock and jazz.  SOF ¶ 132.  In fact, the exact conga part can be heard in many Latin songs, including Willie Colón and Ruben Blades' "Siembra" (1978) at  0:08 and continuing, or Típica '73's "Manono" (1972) at 0:00-0:14 and continuing. SOF ¶ 132.  Along the same reasoning, the *sound effect* of a vibraslap is also not protectable by copyright.  *See Poindexter,* 2012 WL 1027639 at *4; *McDonald,* 1991 WL 311921, at *4.  Finally, the undisputed evidence is that the vocal "Love Break" chant in "Love Break," is not original to "Love Break," but originates with the recording created by Pettibone in 1980, which he has produced in this action on original reel to reel tape.  SOF ¶ 44.

**E.  Plaintiff's infringement claim fails for lack of evidence of access**

---

Loose" (1978), "Bad Luck" (1975), "The Love I Lost" (1973), "Papa's Got a Brand New Bag" (1965), "Get Up Offa That Thing" (1976), "Say It Loud" (1968), "Cold Sweat" (1967), "Super Bad" (1970), "Mother Popcorn" (1969), "I Got the Feeling" (1968), "Express Yourself" (1970).  SOF ¶ 131.

---

Absent direct evidence of copying, a copyright infringement claim requires a fact-based showing that defendant had 'access' to plaintiff's work and that the two works are "substantially similar." *Stewart v. Wachowski*, 574 F. Supp. 2d 1074, 1084 (C.D. Cal. 2005) (citing *Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 481 (9th Cir.2000) (quoting *Smith v. Jackson,* 84 F.3d 1213, 1218 (9th Cir.1996)), *cert. denied,* 531 U.S. 1126, 121 S.Ct. 881, 148 L.Ed.2d 790 (2001)).

"Where there is no direct evidence of access, circumstantial evidence can be used to prove access either by (1) establishing a chain of events linking the plaintiff's work and the defendant's access, or (2) showing that the plaintiff's work has been widely disseminated." *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009) (quoting *Three Boys Music Corp.,* 212 F.3d 477 at 481). "Indeed, a bare possibility will not suffice; neither will a finding of access based on speculation or conjecture. Reasoning that amounts to nothing more than a tortuous chain of hypothetical transmittals is insufficient to infer access. Once the moving party has properly supported his summary judgment motion, the nonmoving party must rebut with significant probative evidence.  Such evidence must be sufficient on its own to support a jury verdict in the nonmoving party's favor. Taking the access and summary judgment standards together, a plaintiff can survive summary judgment only if his evidence is *significantly probative* of a *reasonable opportunity* for access." *Armour v. Knowles*, 512 F.3d 147, 152-54 (5th Cir.2007) (internal citations and quotations omitted).

"First, to logically support a claim that Defendants copied Plaintiff's work, Defendants must have had access to Plaintiff's copyrighted work *before* the creation of the allegedly infringing work." *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1054-55 (C.D. Cal. 2010) (citing *Armour,* 512 F.3d at 152 (no access where infringing work created *prior* to infringed work); *see also Merrill v. Paramount Pictures, Corp.,* 2005 WL 3955653, *8 (C.D.Cal.2005)).

In this case, as discussed above, Plaintiff's expert was clear that the alleged copying could only have come from a particular instrumental version of "Love Break." All Music Guide reports that the instrumental version of "Love Break" was first released in 1992, at least two years after the creation of "Vogue."   SOF ¶¶ 10-12. Plaintiff admits it has no evidence demonstrating that this instrumental version was released, or commercially available, or "widely disseminated," at any time prior to the creation of "Vogue," as is required to prove access.  *Stewart*, 574 F. Supp. 2d 1074 at 1085; *see also Jason v. Fonda,* 526 F.Supp. 774, 776-77 (C.D. Cal. 1981) aff'd., 698 F.2d 966 (9th Cir.1982) (book sales of no more than 2,000 copies nationwide and no more than 700 copies in Southern California did not create more than a bare possibility of access); *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178-79 (9th Cir. 2003) (video that sold approximately 17,000 copies between 1986 and 1999 cannot be considered widely disseminated). Additionally, the undisputed evidence in this case is that Pettibone did not have in his possession the horn chord or other sounds he used to create "Love Break" following his completion of work on that song.[14]  SOF ¶¶ 13-14.

### F.  Pettibone independently created "Vogue," including the horn hit

Even assuming, arguendo, that Plaintiff was able to establish access and substantial similarity, Plaintiff's claim for copyright infringement must be dismissed because Pettibone has shown that the sounds at issue in this case were independently created.

"Independent creation is an affirmative defense to infringement that is invoked once a plaintiff's prima facie case of copying has been made; by establishing reasonable access and substantial similarity, a copyright plaintiff creates a presumption of copying, and burden shifts to defendant to rebut that presumption through proof of independent

---

[14] The only thing Pettibone retained was his reel to reel tape of his vocal chant of "Love Break," which he had recorded years before creating "Love Break."  SOF ¶¶ 13-14.

creation." *Rice v. Fox Broad. Co.*, 148 F. Supp. 2d 1029 (C.D. Cal. 2001) *aff'd in part, rev'd in part*, 330 F.3d 1170 (9th Cir. 2003) . [15] Pettibone has met that burden

Pettibone has presented uncontroverted evidence that he did not have access to the instrumental version of "Love Break," which Plaintiff's expert testified he believes to be the source of the horn sample in "Vogue." SOF ¶ 53.  Additionally, Pettibone has now produced what he believes to be his creation files for the recording of "Vogue," including a disk containing individual horn sounds, drum sounds and a drum loop, and conga and other percussion sounds, from which the horn chord and other sounds in "Vogue" were created.  Pettibone has also found a ¼-inch reel-to-reel tape with a looped recording of the harmonized vocal on the words "love break," which he used to create the recording of "Love Break," and which Frasca and Shimkin used in creating the 12 inch Club Mixes.  SOF ¶¶ 55-56.  In other words, Pettibone has located the ingredients that he mixed together to produce the music on "Vogue. SOF ¶ 57.

It is clear that Pettibone used the horns and drums on Pettibone's creation disk to create the music in "Vogue."  The disk says "Vogue" on the front of it and the sounds on the disc include names such as "Mad Sax," "Mad Bone," "Mad Trumpet," – the "Mad" standing for Madonna, and "Sax," "Bone," and "Trumpet," referring to the instruments that make up the horn chord.  SOF ¶ 58.

To confirm that the sounds from the disk were in fact used in "Vogue," Pettibone's expert compared the sounds using waveform analysis.  SOF ¶ 59. The expert determined that the waveforms of the drum loop contained on Pettibone's creation disk match the "Vogue" drum loop waveforms, verifying that the creation disk does indeed contain the drum loop used to create "Vogue." SOF ¶ 60.  While the horns in "Vogue" are aggregated into a chord such that it is not possible to analyze the waveform of each and compare that waveform to the horn sounds on Pettibone's creation disk, the expert

---

[15] Pettibone raised the doctrine of Independent Creation in his Answer as the ninth affirmative defense to Plaintiff's claim for copyright infringement.  *See* Plt. Answer (Dkt. No. 30).

observed that the horn sounds on the disk include sounds of a trumpet, trombone, and saxophone, which are the same horn sounds in the "Vogue" horn chord. SOF ¶ 61. The expert also concluded through waveform and spectral analysis, both scientific means of analysis, that the "Vogue" horn hit was not sampled from "Love Break." SOF ¶ 62.

With respect to the reel-to-reel tape containing the vocal loop of the words "love break," Pettibone testified to having created said tape for his New York radio show appearances, *prior* to recording "Love Break." SOF ¶ 63. As revealed by expert analysis, this vocal loop on the tape is at the same pitch level as the vocal loops in "Love Break" and "Vogue (Strike-a-Pose Dub)." SOF ¶ 64. A waveform analysis of all three vocal loops – the reel-to-reel tape, the one heard in "Love Break," and the one heard in "Vogue (Strike-a-Pose Dub)," revealed that they each consist of the same sonic material. SOF ¶ 65. The analysis also showed that the clearest and least-processed vocals were those on Pettibone's reel-to-reel creation tape. SOF ¶ 66. Therefore, it is obvious that the vocal loop in "Vogue (Strike-a-Pose Dub)" was not a sample taken from the "Love Break" recording, but was taken from Pettibone's creation tape. SOF ¶ 67. It would not have been possible to reverse-engineer the more processed vocals in "Love Break" to arrive at the crisp and live feel of the vocals on Pettibone's creation tape. SOF ¶ 68. Furthermore, it would have been impossible to extract the sounds on Pettibone's creation tape as a sample from "Love Break" without more artifactual presence of the percussion overlaid on the "Love Break" recording. SOF ¶ 69.

Where a plaintiff cannot show a reasonable opportunity for access, as is the case here, proof that the protected and accused works are "strikingly similar" gives rise to an inference of copying. *Baxter v. MCA, Inc.,* 812 F.2d 421, 423, 423 n. 2 (9th Cir. 1987). However, to show a striking similarity between works, a plaintiff must produce evidence that the accused work *could not possibly* have been the result of independent creation. *Walker v. Univ. Books, Inc.,* 602 F.2d 859, 864 (9th Cir.1979). Here, Plaintiff has not produced any evidence suggesting that Pettibone could not possibly have

independently created the sounds at issue in "Vogue." To the contrary, and fatal to Plaintiff's claim for copyright infringement, Pettibone has produced clear evidence that the allegedly copied music  in "Vogue" was in fact created using the Akai and Proteus machines, and the sounds on his disk labeled "Vogue." SOF ¶¶ 55-69. Where similarities between works are the result of independent creation, there is no copyright infringement. *Shaw v. Lindheim*, 809 F. Supp. 1393 (C.D. Cal. 1992); 17 U.S.C. § 101 *et seq.*  Plaintiff's claim must be dismissed.

### G. Plaintiff concedes the alleged copying, which Pettibone denies, cannot be heard by the ordinary observer, meaning the two works are not substantially similar

In its Complaint, Plaintiff alleges that the horn sample from "Love Break" in "Vogue" is purposefully "hidden" and "disguised," and, as a result not only cannot be heard by the ordinary observer, but was impossible to detect until supposedly new technology was invented in 2011.  SOF ¶ 117.  Plaintiff made those allegations in the transparent attempt to avoid the Copyright Act's three year statute of limitations, and this Court relied on those allegations in denying Defendants' Motion to Dismiss seeking to limit the damages in this action to the three years preceding the filing of this action. Dkt. No. 29.

As a result, Plaintiff is now judicially estopped from taking a position that differs from those allegations.  *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1133 (9th Cir. 2012); *United Nat. Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 779-80 (9th Cir. 2009); *Interstate Fire & Cas. Co. v. Underwriters at Lloyd's, London,* 139 F.3d 1234, 1239 (9th Cir. 1998) (judicial estoppel applies to same litigation); *Yanez v. United States,* 989 F.2d 323, 326 (9th Cir. 1993).[16]

---

[16] *See also Bistro Executive, Inc. v. Rewards Network, Inc.*, CV 04-4640 CBM MCX, 2006 WL 6849825, at *5 (C.D. Cal. July 19, 2006); *Roderick v. Mazzetti & Associates, Inc.*, C 04-2436 MHP, 2006 WL 1883328, at *5 (N.D. Cal. July 7, 2006); *O'Brien v. City of Tacoma*, C04-5458FDB, 2005 WL 2045882, at *2 (W.D. Wash. Aug. 24, 2005).

The law in this Circuit is clear: even where actual copying is conceded, if an ordinary observer would not detect the similarity as coming from the original copyrighted source, the similarity is not substantial, and no legally actionable infringement has occurred.  *Newton*, 388 F.3d at 1192-93 (citing *Fisher v. Dees*, 794 F.2d 432 (9th Cir. 1986) (even if copying is established, no legal consequence attaches if ordinary observer would not recognize the appropriation); *see also* 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.01[B], at 13-8, 13-9 ("First, there is the factual question whether the defendant, in creating its work, used the plaintiff's material […] If the answer is "yes," then one can conclude, *as a factual proposition*, that copying may have occurred. But the question remains whether such copying is actionable. In other words, *that first answer does not vouchsafe resolution of the legal question whether such copying as took place gives rise to liability for infringement*"); *Williams v. Kaag Mfrs., Inc.*, 338 F.2d 949 (9th Cir. 1964) (applying the ordinary observer test to determine substantial similarity), *accord* Nimmer, § 13.03[E], at 13-92, 13-94 (discussing ordinary observer test to determine substantial similarity); *Id.* § 13.03[A], at 13-30.2.

Here, at least with respect to the horn hits in "Vogue," Plaintiff has conceded that the alleged copying is not only not detectable by the "ordinary listener," but is actually "hidden" and "disguised."  Plaintiff is judicially estopped now from claiming otherwise.

In addition, as discussed fully above, the single chord horn hit in "Vogue," and the conga and percussion in the 12-inch Club Mixes, are not only not original or copyrightable, but exist in numerous recordings and musical compositions that pre-date "Love Break." SOF ¶¶ 131-132. As a result, the ordinary observer test also fails because the ordinary observer would not recognize the less than quarter second horn hit and ubiquitous conga/cymbal as originating with "Love Break," as is required to set forth a cognizable infringement claim.  *McIntosh v. N. California Universal Enterprises Co.*, 670 F. Supp. 2d 1069, 1087 (E.D. Cal. 2009) ("The test of infringement is whether the work is recognized by an ordinary observer as having been taken from the copyrighted

source.") (quoting *Bradbury v. Columbia Broad. Sys., Inc.*, 287 F.2d 478, 485 (9th Cir. 1961)).

### H. Plaintiff's  infringement claims also must be dismissed as *De Minimis*

"For an unauthorized use of a copyrighted work to be actionable, the use must be significant enough to constitute infringement." *Newton*, 388 F.3d at 1192-93 (citing *Ringgold v. Black Entm't TV*, 126 F.3d 70, 74-75 (2d Cir. 1997)). "The principle that trivial copying does not constitute actionable infringement has long been a part of copyright law.  Indeed, as Judge Learned Hand observed over eighty years ago: 'Even where there is some copying, that fact is not conclusive of infringement. Some copying is permitted. In addition to copying, it must be shown that this has been done to an unfair extent.'" *Id.* (quoting *West Publ'g Co. v. Edward Thompson Co.*, 169 F. 833, 861 (E.D.N.Y. 1909)). This principle reflects the legal maxim, *de minimis non curat lex* (often rendered as, "the law does not concern itself with trifles"). *Id.* (citing *Ringgold*, 126 F.3d at 74-75).

The Ninth Circuit in *Newton* explained the correlation between the *de minimis* maxim and the general test for substantial similarity, noting that for both, the court looks to the response of the average audience, or ordinary observer, to determine whether a use is infringing.  *Newton*, 388 F.3d at 1193.  As the *Newton* court stated:  "A leading case on *de minimis* infringement in [the Ninth] circuit is *Fisher v. Dees*, 794 F.2d 432 (9th Cir. 1986), where we observed that a use is *de minimis* only if the average audience would not recognize the appropriation." *Newton*, 388 F.3d at 1193.  "This observation reflects the relationship between the *de minimis* maxim and the general test for substantial similarity, which also looks to the response of the average audience, or ordinary observer, to determine whether a use is infringing." *Id.* (citing *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002)).  "To say that a use is *de minimis* because no audience would recognize the appropriation is thus to say that the use is not sufficiently significant." *Id.*

Here, both as pleaded by Plaintiff, and otherwise, the ordinary observer would not recognize the single chord horn hit or stab in "Vogue," or the conga and percussion in the 12-inch Club Mixes, as originating with "Love Break," and any use of those sounds in "Vogue" or the 12 Inch Club Mixes, is *de minimis* as a matter of law.  In addition, copying is *de minimis* if the portion copied is neither qualitatively nor quantitatively significant in relation to the plaintiff's work as a whole.  *Newton*, 388 F.3d at 1195 (citing *Worth v. Selchow & Righter Co.*, 827 F.2d 569, 570 n.1 (9th Cir. 1987) ("[T]he relevant inquiry is whether a substantial portion of the protectable material in the plaintiff's work was appropriated").

In *Newton*, the Court held that no reasonable juror could find the 3-note sampled portion of the composition to be a quantitatively or qualitatively significant portion of the composition as a whole.  The Ninth Circuit noted that the segment lasted only "six seconds" of the plaintiff's work, and was roughly two percent of the four-and-a-half-minute "Choir" sound recording.  *Newton*, 388 F.3d at 1195-96.  Qualitatively, the section of the composition was no more significant than any other section.  *Id.*

In this case, the single chord horn sound in "Love Break" lasts approximately .23 seconds (or less than a quarter of a second, even less than in *Newton*).  While standing alone or in a pattern of two hits, this chord makes multiple appearances in the original "Love Break," the cumulative duration is only 16 seconds out of more than seven minutes of recorded music.  SOF ¶¶ 28, 31. In the instrumental version, it appears only for 11.5 seconds total.  SOF ¶ 29.  The chord is also not sounded for the first 4:39 (after more than half the recording has elapsed) in the original "Love Break", and not until 3:11 seconds have elapsed in the instrumental version, before which in both versions all of the most important material in the recording has been introduced. SOF ¶ 30.  The single chord horn hit is, as a result, both quantitatively and qualitatively *de minimis*.

Likewise, the vocals and congas with respect to the 12-inch Club Mixes are quantitatively and qualitatively *de minimis* as well.  First, as noted, these elements are

not even present in the original "Love Break," or the instrumental version, but appear only in the remix titled "Ooh I Love It (Original Shep Pettibone 12" Remix). SOF ¶ 33. The fact that the vocals and congas do not even appear in the commercially released version of "Love Break," proves their insignificance. An ordinary observer would not identify any alleged copying of the ubiquitous congas/cymbal supposedly found in the "Vogue" 12-inch Remixes to be derived from the 12 inch remix of "Love Break."

## I. In the alternative, Plaintiff's copyright infringement claim should be limited to the statutory three year period

If any portion of this lawsuit remains, which it should not, the Court should limit Plaintiff's claim to alleged infringements that took place only between July 11, 2009 and the filing of Plaintiff's Complaint on July 11, 2012. As the Court held in its January 29, 2013 Order, where a plaintiff files a "copyright claim more than three years after it discovered or should have discovered infringement," "a plaintiff's right to damages is 'limited to those suffered during the three years prior to filing the suit." Dkt. No. 29 at 5 (citing *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 705-06 (9th Cir. 2004). "Courts typically do not allow plaintiffs to preserve an untimely claim through the delayed discovery rule when the material at issue has been widely disseminated through mass media publication." *Benjamin v. Walt Disney Co.*, CV 05-2280GPS, 2007 WL 1655783 (C.D. Cal. June 5, 2007) (nationwide release).

"Vogue" is an iconic song recognized as one of the best dance songs of the 1990s, and like the work in *Benjamin v. Walt Disney*, has been widely disseminated through various forms of mass media.[17] SOF ¶ 71. Furthermore, as discussed earlier, several years prior to Verse's acquisition of Salsoul in 2010, Salsoul investigated whether "Vogue" might contain a sample of the "Love Break" sound recording and decided not to pursue it. SOF ¶¶ 104-107; 110-113. This was communicated to Frasca during the

---

[17] Plaintiff admits "Vogue" has been listed among the best dance song of the 1990s and further admits "Vogue" was featured in the motion picture "The Devil Wears Prada," released in 2006. SOF ¶ 71. Madonna's fame speaks for itself.

due diligence process of the Verse acquisition of Salsoul.  SOF ¶ 89-92. Salsoul's inaction and knowledge is imputed to Plaintiff.  1 *Nimmer on Copyright* § 5.01[B] (1999) ([copyright] assignee [cannot] claim rights that would not have been available to his assignors); *Baker Hughes, Inc. v. Davis–Lynch, Inc.,* 2000 WL 33993301, at *9 (S.D. Tex. 2000) (same).

Plaintiff also cannot provide <u>any</u> evidence to support its contention that nobody was able to "confirm" the alleged sampling until certain technology was available to it in 2011.  SOF ¶ 122.  To the contrary, Plaintiff admits that the purported technology used was a "wave analysis done by its expert," and also acknowledges that sound wave analysis has been around for decades.[18]  SOF ¶¶ 118-120.  Frasca and Shimkin also now state the sampling was obvious, and not hidden, and would be supposedly recognizable to an ordinary observer.  SOF ¶ 123.  Plaintiff's expert testified he performed the same analysis he has been performing his entire career. SOF ¶ 129.  Plaintiff is limited to three years of damages.  *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481-482 (9th Cir. 1994).

## IV.   CONCLUSION

For the above reasons, Pettibone and Lexor Music, Inc. respectfully requests the Court grant their Motion.

DATED:  June 11, 2013                         Respectfully submitted,


                                              PAUL H. DUVALL
                                              KING & BALLOW


                                              By:  _____/s/ Paul H. Duvall_____
                                                         PAUL H. DUVALL

                                              Attorney for  Defendants Shep
                                              Pettibone and Lexor Music, Inc.

---

[18]  Indeed, Pettibone's expert witness, Dr. Gage Averill, has used waveform analysis (with spectrographic display) on computers since 1989.  SOF ¶ 129.