1  Robert Besser (SBN: 46541)
   rsbesser@aol.com;
2  Christopher Chapin (SBN: 112608)
   christopherchapin@aol.com
3  LAW OFFICES OF ROBERT S. BESSER
   1221 Second Street, Third Floor
4  Santa Monica, CA 90401
   Tel: (310) 394-6611; Fax: (310)
5  394-6613

6
   Joseph P. Costa (SBN: 130131)
7  jcosta@cacllp.com
   Darius A. Vosylius (SBN: 175030)
8  Lindsay T. Cinotto (SBN: 258852)
   COSTA ABRAMS & COATE LLP
9  1221 Second Street, Third Floor
   Santa Monica, CA 90401
10 Tel: (310) 576-6161; Fax: (310)
   576-6160
11 *Attorneys for Plaintiff VMG
   Salsoul, LLC*

12

13              **IN THE UNITED STATES DISTRICT COURT**

14          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

15

| | |
|---|---|
| 16  VMG SALSOUL, LLC, a Delaware limited liability company, | Case No. CV-12-5967-BRO (CWx) |
| 17 | |
| 18              Plaintiff | [Assigned to the Hon. Beverly Reid O'Connell] |
| 19      vs. | |
| 20  MADONNA LOUISE CICCONE, professionally known as MADONNA, | **PLAINTIFF'S RESPONSE AND OPPOSITION TO DEFENDANT WARNER BROS. RECORDS INC. AND WARNER** |
| 21  an individual; SHEP PETTIBONE, an individual; WB MUSIC | **MUSIC GROUP CORP.'S "SUPPLEMENTAL MEMORANDUM IN** |
| 22  CORPORATION, a Delaware corporation; BLUE DISQUE MUSIC | **SUPPORT OF JOINDER" AND "ALTERNATIVE MOTION FOR PARTIAL** |
| 23  COMPANY, INC. a corporation; WEBO GIRL PUBLISHING, INC., a | **SUMMARY JUDGMENT"** |
| 24  California corporation; LEXOR MUSIC, INC., a New York | Date: August 26, 2013 |
| 25  corporation; and DOES 1 through 10 inclusive, | Time: 1:30 p.m. Place: Courtroom 14 |
| 26 | |
| 27              Defendants. | Action Filed: July 11, 2012 |

28

1

1

## TABLE OF CONTENTS

2

I. Introduction and Summary of Argument...........................................2

3

II. WBR/WMG's Procedural Irregularities ..........................................6

4

III. Plaintiff's Streamlined Claim.....................................................7

5

IV. The Horn Sample and the Manner in Which it is Used is Important
6   for Both Songs, is Original and is Protectible.............................11

7

    A. Dr. Stewart's Expert Opinions Cannot Be Minimized...................12

8

    B. The Importance of the Horn Sample for *Chicago Bus Stop*......12

9

    C. The Importance of the Horn Sample for *Vogue*.......................13

10

    D. Applicable Law Re: "Originality"........................................13

11

    E. The Horn Hit Was Independently Created.............................14

12

    F. The *Newton v. Diamond* Case is Easily Distinguishable...........16

13

    G. The *"De Minimis"* Affirmative Defense..............................17

14

15

V. Whether *Love Break* is a Derivative Work and Whether Ken Cayre's
16  Declaration Should Be Stricken is a Red Herring...........................19

17

VI. Plaintiff is Entitled to Seek Defendants' Profits........................21

18

19

20

21

22

23

24

25

26

27

28

i

1

## TABLE OF AUTHORITIES

2

**I. Case Law**

3   *Business Trends Analysts, Inc. v. Freedonia,* 887 F.2d 399, 407 (2d
4   Cir. 1989).......................................................................................................23

5   *Dorn v. Burlington,* 397 F.3d 1183, 1196 (9th Cir. 2005)....................12

6   *Feist v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 361 (1991)....14

7   *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,* 772 F.2d 514, 517
8   (9th Cir. 1985).............................................................................................24

9   *Goldman v. Standard Ins.,* 341 F.3d 1023, 1034 (9th Cir. 2003).........12

10  *Goodman v. Staples The Office Superstore, LLC,* 644 F.3d 817, 827
11  (9th Cir. 2011)..........................................................................................21

12  *In Re Independent Serv. Orgs. Antitrust Litig.,* 23 F. Supp. 2d
13  1242, 1250 (D. Kan. 1998)........................................................................23

14  *Jarvis v. A&M Records,* 827 F. Supp. 282, 290-1 (D. N.J. 1993).........18

15  *Knitwaves, Inc. v. Lollytogs,* 71 F.3d 996, 1003-1004 (2nd Cir.
16  1995)...........................................................................................................15

17  *Mackie v. Rieser, supra* 296 F.3d 909, 914 (9th Cir. 2002)............23, 25

18  *Newton v. Diamond,* 388 F.3d 1189, 1193, 1195 (9th Cir.
19  2000)......................................................................................................16, 17

20  *North Coast Industries v. Maxwell,* 972 F.2d 1031, 1033 (9th Cir.
21  1992)..........................................................................................................14

22  *Polar Bear v. Timex,* 384 F.3d 700 (9th Cir. 2004)............................24

23  *Self-Realization Fellowship Church v. Ananda Church,* 206 F.3d 1322,
24  1328 (9th Cir. 2000)...............................................................................20

25  *Sheldon v. Metro-Goldwyn Pictures,* 309 U.S. 390, 406
26  (1940).........................................................................................................23

27  *Swirsky v. Carey* 376 F.3d 841, 843 (9th Cir. 2004).........................5

28  *Three Boys Music v. Bolton,* 212 F.3d 477 (9th Cir. 2000)...............16

ii

*Tin Pan Apple, Inc. v. Miller Brewing,* 1994 U.S. Dist. LEXIS 2178 at *4, *10–13 (S.D.N.Y. 1994)............................................................16

*Twentieth Century Fox v. Entn't Distrib.,* 429 F.3d 869, 881-82 (9th Cir. 2005)..........................................................................................20

*William v. Broadus,* 2001 U.S. Dist. LEXIS 12894 at *14.........................18

*ZZ Top v. Chrysler Corp.,* 54 F. Supp. 2d 983, 984-86 (W.D. Wa. 1999)..........................................................................................18

## II. Statutes

17 U.S.C. § 504 (b) ............................................................22, 23, 24

## III. Secondary

4-13 Nimmer on Copyright § 13.03, fn. 264.80.................................6

4 Nimmer on Copyright, § 13.03[A][2][a]........................................18

iii

## MEMORANDUM OF POINTS AND AUTHORITIES

I.    INTRODUCTION AND SUMMARY OF ARGUMENT.

Contrary to Warner Bros. Records Inc. and Warner Music Group Corp.'s [collectively "WBR/WMG"] characterization, this is not a case of a one-time use of a "quarter-second snippet of a single chord." This is not about an inconsequential measure of music. This case is about an original horn part, played in a certain creative manner, that was deliberately sampled from Plaintiff's work (*Chicago Bus Stop/Love Break*) **and used repeatedly** throughout *Vogue*.  These horn hits are "the central or prominent compositional elements" in *Chicago Bus Stop* and comprise "nearly 31%" of *Chicago Bus Stop*. (Additional Undisputed Material Fact ("AUMF")No. 42).

These same live horn hits are also important for *Vogue*. They "embody a significant call and response pattern" within *Vogue*, and that the horn parts . . . comprise . . . approximately 16 seconds of *Vogue*." (AUMF No. 44.) These horn hits are qualitatively and quantitatively important. The first is a single horn hit which is described as the "call," while the second is a double horn hit which occurs two measures later and is described as the "answer."[1] This same structure is also present in *Vogue*.  Therefore, contrary to defendants'

2

characterization, the horn hits at issue are much more than just one chord that appears once for a "quarter-second."

If this part was so trivial and inconsequential, why did Shep Pettibone intentionally sample it and incorporate it **throughout** *Vogue*? If this was so trivial and inconsequential, then why did defendants' own expert witness (Gage Averill) opine that Shep Pettibone "wanted to capture the essence of the sound of the . . . horn hits by emulating them in [*Vogue*]"?[2] If this was so trivial and inconsequential, then why was an entire separate track devoted to the horns on the original master multi-track recording of *Vogue*? (AUMF No. 46). If this was so trivial and inconsequential, then why did it appear **two hundred nineteen (219) times** in the multi-track recording for *Vogue*?[3] (AUMF No. 45.)

Even though WBR/WMG claims to be viewing this case from a set of "fresh eyes," most of the "supplemental memorandum" simply regurgitates the same arguments that the other defendants have already made.[4] WBR/WMG also spends a considerable amount of

---

[1] *See, e.g.* ¶23 of Dr. Stewart's May 6, 2013, expert report, a portion of which is attached as Exhibit "J" to the Supplemental Declaration of Robert S. Besser ("Supp. Besser Dec.") ¶3.
[2] *See* Supplemental Declaration of Robert S. Besser ("Supp Besser Dec.") ¶2; Exhibit "I."
[3] *See* Supp Besser Dec. ¶3; Exhibit "J."; *see also* AUMF No. 45.
[4] To the extent WBR/WMG makes the same arguments as the co-defendants, then Plaintiff incorporates herein the same arguments made in its opposition papers previously filed before this Court.

time focusing on issues and topics that WBR/WMG ultimately

concedes are not being prosecuted, such as the fact that

Plaintiff is not making a copyright infringement claim with

respect to the "strings" or the "conga, vibraslap and chant."[5]

WBR/WMG is even seeking summary judgment on claims that

Plaintiff admittedly is not even pursuing (*i.e.* the "strings"

and the "conga, vibraslap and chant")[6] It is unclear why WBR/WMG

spends so much time on these non-issues, other than to perhaps

confuse the Court. Rather, the only "new" argument made by

WBR/WMG is their one and a half page argument at the end that

Plaintiff is not entitled to recover defendants' "profits."

However, that is not the case as explained below.

WBR/WMG also spends some time criticizing Plaintiff for

presenting a "moving target," for "dwindling" down its case, and

chastises Plaintiff's expert witness (Dr. Stewart) for changing

his opinion on a few topics.  However, it was only **after** WBR/WMG

produced the *Vogue* multi-track master recordings, which they

delayed producing until formally forced under the threat of a

Motion to Compel, that Dr. Stewart was allowed to perform a more

in-depth analysis. This additional analysis also strengthened

---

[5] Rather, as WBR/WMG concedes, the "conga, vibraslap and chant" are relevant for a different issue: they conclusively prove that Shep Pettibone deliberately sampled from *Chicago Bus Stop/Love Break* while producing *Vogue*.
[6] Plaintiff's streamlined case is summarized below.

4

Dr. Stewart's conviction[7] that defendants engaged in sampling of a "horn hit" and that this sampling from *Chicago Bus Stop/Vogue* was qualitatively and quantitatively important for *Vogue*. AUMF Nos. 41 – 47. That is a critical fact and is **fatal** for defendants' motions for summary judgment.

Because of Dr. Stewart's opinions, Plaintiff has more than met its burden. Dr. Stewart's  testimony has created a triable issue of material fact in this music copyright infringement case.  No matter how many times defendants try to distance themselves from the holding of *Swirsky v. Carey*, 376 F.3d 841 (9th Cir. 2004), the inconvenient truth for them is that ***Swirsky is binding on this Court***. Professor Nimmer concedes that under *Swirsky*, "any plaintiff who can retain a testifying expert [in a music copyright infringement case] will avoid an adverse summary judgment." 4-13 Nimmer on Copyright § 13.03, fn. 264.80 *citing to Swirsky* at 843.[8]

---

[7] Dr. Stewart's June 14, 2013, "supplemental report"  is attached in its entirety as Exhibit "K" to the Supp. Besser Dec.
[8] In their moving papers, WBR/WMG cites to *Gable v. National Broadcasting Corp,* 727 F.Supp.2d 815 (C.D. Cal 2010) for the proposition that summary judgment may sometimes be appropriate even though there are "dueling expert reports." However, the *Gable* case is easily distinguishable because **it is not a music copyright infringement case.** Rather, at issue in *Gable* was an unsolicited movie script that was allegedly infringed by the television show *My Name Is Earl*. This is critical because as the *Swirsky* Court observed, music copyright infringement cases are much different than a traditional infringement case.

*Swirsky* teaches us that a trial court cannot substitute its opinions for those of an expert witness. In other words, this Court has to give credit to Plaintiff's experts and cannot discount their opinions in any manner when ruling on these summary judgment motions. The nuanced ear and professional opinions of Dr. Stewart[9] are what matter here. For all of these reasons, and because all of the facts and inferences must be construed in the light most favorable to the Plaintiff, it is plainly evident that summary judgment should be denied.

## II.   WBR/WMG's PROCEDURAL IRREGULARITIES.

There are several procedural irregularities with WBR/WMG's document.  This does not resemble a traditional "joinder" by any stretch of the imagination.  Rather, WBR/WMG has taken this opportunity to not only "join" in the arguments made by their co-defendants but is also attempting to "clean up" their other problems. For instance, WB Music Corporation and Webo Girl Publishing, Inc. have not moved for "partial summary judgment."[10]

Now, WBR/WMG is trying to correct that apparent oversight

---

[9] Dr. Stewart is a full time music professor, a professional musicologist as well as an active professional musician who has performed with leading musicians in jazz and popular music for more than thirty (30) years. *See* ¶1 of Exhibits "J" and "K" attached to the Supp. Besser Dec.

[10] At the last hearing on July 18, 2013, counsel for WB Music Corporation and Webo Girl Publishing, Inc. indicated that they will stand on their papers and not submit additional filings. The fact that their WBR/WMG has now requested a "motion for

by asking the Court to grant "partial summary judgment" for all of the defendants. This "supplemental memorandum" is actually a new motion wherein WBR/WMG is seeking partial summary judgment on issues relating to not just the sound recordings of *Vogue* (owned by WBR/WMG), but also the composition of *Vogue* (owned by some of the other co-defendants).  However, WBR/WMG previously represented to the Court that they held no rights in the composition of *Vogue* and that they were completely separate entities from the co-defendants that did own those rights.[11] The result is effectively a procedurally non-conforming case dispositive motion; *i.e.*, since coined as a joinder, WBR/WMG has not submitted or referenced any alleged "uncontroverted material facts" in violation of Central District Rule 56-1. Nor has WBR/WMG provided the required twenty-eight days of statutory notice for the Court (although the opposition time is admittedly not impacted) for such motions under Local Rule 6-1, or engaged in any required pre-filing conference, significant when considering that they are seeking partial summary judgment on legal determinations that are not part of the factual dispute

---

partial summary judgment" on their behalf sheds light on the lack of sincerity in their position.

[11]  These representations were made by WBR/WMG in connection with their opposition to Plaintiff's motion to amend the complaint to add them as parties to this action.

between the parties.[12] Despite this, there is nothing within this new motion for partial summary judgment that justifies any of the sought after relief.

### III. PLAINTIFF'S STREAMLINED CLAIM.

This action was filed back on July 2012. Since then, significant discovery has taken place. WBR/WMG only recently produced the master multi-track recordings for *Vogue*. Based on these developments, Plaintiff's claims have been simplified, which is not unusual in a civil case. For this reason, it is beneficial to reiterate Plaintiff's streamlined claim.

This is a case of copyright infringement based upon the sampling of a live horn section from the song *Chicago Bus Stop*. Plaintiff owns the copyright to the composition and sound recording of *Chicago Bus Stop*.

The horn sample at issue in this action are "the most prominent compositional elements" in *Chicago Bus Stop* and that the "total time they are the central or prominent compositional elements in CBS [*Chicago Bus Stop*] is 88 seconds or nearly 31% of the 4:47 song." (AUMF No. 42).

In 1982, the prior owner of *Chicago Bus Stop* (Ken Cayre of Salsoul Records/Bethlehem Music) hired a record producer named Shep Pettibone to remix *Chicago Bus Stop*.  At that time, Mr.

_____

[12] If the required notice has not been given, a court generally lacks authority to grant the motion. *Reese v. Sparks* 760 F.2d

Pettibone did not read or write music or play an instrument. (AUMF No. 29).   Ken Cayre submitted a declaration indicating that Mr. Pettibone was hired under a written work for hire agreement. As part of this "work for hire" agreement, Mr. Pettibone introduced a "conga, vibraslap and chant" to the *Chicago Bus Stop* recording; however, kept the original and distinctive live horn parts from *Chicago Bus Stop* in the re-mix called *Love Break*.

In 1989, Shep Pettibone produced a song that became *Vogue*. Mr. Pettibone admitted that he only had a $3,000 budget to create *Vogue*, which was not enough to hire live horn players. Mr. Pettibone sampled[13] portions of *Chicago Bus Stop/Love Break* to create *Vogue,* as discussed in much greater detail in Plaintiff's prior opposition papers, and then "looped" that sample throughout the recording *Vogue*.   Remarkably, Mr. Pettibone has stated under oath that he did not use **any** samples in the creation of *Vogue*.

Two individuals (Shimkin and Friedman)witnessed Shep Pettibone sampling. The recently produced multi-track recordings from WBR/WMC also provide more evidence of sampling, including

---

64, 66 (3rd Cir. 1985).
[13] Digital sampling without permission has been held repeatedly to constitute copyright infringement. *See, e.g., Jarvis v. A&M Records*, 827 F. Supp. 282, 295 (D.N.J. 1993) ["There can be no more brazen stealing of music than digital sampling."].

the presence of "audible "pops" and "crackles" from a vinyl recording. (AUMF Nos. 36, 37.)

Plaintiff's expert concludes that the sample from *Chicago Bus Stop/Love Break* does indeed appear on *Vogue*. Dr. Stewart opines that the horn sounds in *Vogue* are clearly the sounds of live musicians and are identical to the live horn sounds on *Chicago Bus Stop*. The horn hit that was sampled from *Chicago Bus Stop/Love Break* into *Vogue* consisted of a trumpet and trombone. (AUMF No. 43)   Furthermore, the horn hit that was sampled was played in a creative manner and that "no individual player will ever be entirely consistent or uniform in the way he or she produces a note." (AUMF No. 47).

Dr. Stewart also testifies that the horn hits at issue in this litigation are important qualitatively to both *Chicago Bus Stop* as well as *Vogue* because the constant repetition of the single and double hits throughout the songs provide a "significant call and response pattern" that are important compositional elements for both songs. AUMF No. 41. "Each 'call' of the single horn hit anticipates the 'answer' of the double horn hit two measures later." (See ¶23 of Dr. Stewart's May 6, 2013, report).

Conversely, defendants' expert contends that Shep Pettibone specifically (and apparently intentionally) emulated the horn parts from *Chicago Bus Stop/Love Break* by using a synthesizer

10

called a Proteus to re-create the sound.   (AUMF No. 40). It is

clear that there is a dispute on many material facts. This of

course means that summary judgment cannot be granted.

## IV.   THE HORN SAMPLE AND THE MANNER IN WHICH IT IS USED IS IMPORTANT FOR BOTH SONGS, IS ORIGINAL AND IS PROTECTIBLE.

One of the main arguments that WBR/WMC makes is that the

horn sample at issue in this action is "trivial," is not

"original" and not entitled to copyright protection.  In support

of these arguments, WBR/WMC selectively quotes from the

deposition transcript of Curt Frasca.  However, Mr. Frasca is

not a musicologist, and his layman's opinion is clearly taken

out of context. To the contrary, Dr. Stewart spends a

considerable amount of time explaining why the horn hit and the

way it is repeatedly used is quantitatively and qualitatively

important as well as "original" for purposes of a copyright

infringement analysis. (Exhibits "J" and "K" attached to the

Supp. Besser Dec.)

### A.   Dr. Stewart's Expert Opinions Cannot Be Minimized

The competing opinions from the experts in this case create

a question of fact rendering summary judgment improper.  While

assessing evidence in consideration of a motion for summary

judgment, it bears repeating that a court's role "is not to

'weigh evidence [or] determine the truth of the matter, but to

determine whether there is a genuine issue for trial.'" *Goldman*

11

*v. Standard Ins.*, 341 F.3d 1023, 1034 (9th Cir. 2003).  The "authority to determine the victor in such a 'battle of expert witnesses' is properly reposed in a jury." *Dorn v. Burlington*, 397 F.3d 1183, 1196 (9th Cir. 2005) (citation omitted).

**B.   The Importance Of The Horn Sample For *Chicago Bus Stop***

In his May 6, 2013, report, Dr. Stewart discusses in great detail the significance of the horn sample at issue in this action and the manner in which it is used within *Chicago Bus Stop*.[14] In paragraph 23, Dr. Stewart explains as follows:

> "During this 32-second section (1:42 to 2:14) the call and response horn parts are heard four times. . . they are the most important compositional element during this section. . . The horn parts' importance extends to this entire section of music: they are distributed evenly throughout the entire 32-measure sequence and each "call" of the single horn hit anticipates the "answer" of the double horn hit two measures later. Two more identical pairs of call and response horn parts appear later in the song during a saxophone solo for 16 seconds (4:00 – 4:16) where again they are the most prominent compositional element. The seconds of the song in which these horn parts appear as the main compositional theme then total 48 seconds. They are also heard briefly from 2:56 to 3:04. From 2:47 to 3:03 they appear during the "do do do d-do" vocals and the hook vocal line "Ooh I love it." From 3:03 to 3:19 they appear in a slight variation: two single chords followed by one double. The total time they are the central or prominent compositional elements in [Chicago Bus Stop] is 88 seconds or nearly 31% of the 4:47 song. . . The fact that [*Chicago Bus Stop*] is

---

[14] Dr. Stewart's analysis on this matter is important because the relevant inquiry in a copyright infringement action "is whether a substantial portion of the protectable material in the *plaintiff's* work was appropriated – not whether a substantial portion of *defendant's* work was derived from plaintiff's work." *Newton v. Diamond*, 388 F.3d 1189,1195 (9th Cir. 2003)

predominantly an instrumental and contains little
vocals only enhances their importance. Clearly they
are important to *Chicago Bus Stop* and must be
considered one of the main musical motifs."

C.   **The Importance Of The Horn Sample For *Vogue*.**

Dr. Stewart's May 6, 2013, report also discusses in
paragraphs 22 and 24 how the horn sample at issue in this
action is important for *Vogue*. He opines as follows:

"In *Vogue*, the horn parts do appear at structurally
significant moments, for example at the end of the
lengthy introduction answering the whispering of the
title ("vogue, vogue, vogue"). As an important marker
of the modulation into the song's new key center (A
flat dominant) and the entrance of the first verse,
the horn parts anticipate the G flat (or F sharp) of
the syncopated string "stabs" in the next measure that
resolve upward to the tonic of the new key A flat). .
. The horn parts appear again at the next major
structural shift in the song, the breakdown into the
rap section. A third important appearance of the horn
parts is during the breakdown section where the only
other sound is the keyboard."

D.   **Applicable Law Re: "Originality"**

"Original" in reference to a copyrighted work means that
the particular work owes its origin to the author. No large
measure of novelty is required. *North Coast Industries v.
Maxwell*, 972 F.2d 1031, 1033 (9th Cir. 1992). In other words,
"original" as the term is used in copyright, means only that the
work was independently created by the author (as opposed to
copied from other works), and that it possesses at least some
minimal degree of creativity." F*eist v. Rural Tel. Serv. Co.,
Inc.*, 499 U.S. 340, 361 (1991).  The level of originality and

13

creativity that must be shown is minimal, only an "unmistakable dash of originality need be demonstrated, high standards of uniqueness in creativity are dispensed with." *Folio Impressions v. Byer*, 937 F.2d 759, 764-65 (2nd Cir. 1991) [finding that a fabric pattern consisting of an arrangement of roses on a straight line possessed the requisite amount of creativity].

### E. The Horn Hit Was Independently Created

In this case, the horn hit and the sequence in which it is played is "original" since it was independently created by Plaintiff's predecessor in interest.  Defendants have not provided any admissible evidence that this horn sample in *Chicago Bus Stop* was copied from other works.  There also is no doubt that the horn sample possesses "at least some minimal degree of creativity," as Dr. Stewart confirms. *Feist* at 361. Dr. Stewart explained that the horn sample was played in a creative manner and that "no individual player will ever be entirely consistent or uniform in the way he or she produces a note." (AUMF No. 47).

Therefore, defendants' contention that Plaintiff cannot obtain copyright protection for the horn portion sampled and the sequence in which it is utilized is without merit. If a court were to follow this suggestion, then the court "might have to decide that there can be no originality in a painting because all colors of paint have been used somewhere in the past."

14

*Knitwaves v. Lollytogs*, 71 F.3d 996, 1003-1004 (2nd Cir. 1995) ["A work may be copyrightable even though it is entirely a compilation of unprotectable elements"].

While it should be clear from Dr. Stewart's report that the "horn hit" is original, even if there were some question as to originality, these are issues which must be left for the trier of fact to resolve at trial. *See Vargas v. Pfizer, Inc.*, 418 F.Supp.2d 369, 372-373 (S.D.N.Y. 2005) ["Typically, '[w]hen the originality of a copyrighted work is at issue, it becomes a question of fact for the jury to resolve.'"]; *quoting Tin Pan Apple v. Miller Brewing*, 1994 U.S. Dist. LEXIS 2178 at *4, (S.D.N.Y. 1994). Furthermore, it should be noted that the Ninth Circuit has upheld a jury finding of substantial similarity based on the plaintiff's musical expert's testimony that the copied and accused songs shared a combination of five unprotectable elements including: "(1) the title hook phrase (including the lyric, rhythm, and pitch); (2) the shifted cadence; (3) the instrumental figures; (4) the verse/chorus relationship; and (5) the fade ending." *Three Boys Music v. Bolton,* 212 F.3d 477, 485 (9th Cir. 2000).

F.    **The *Newton v. Diamond* Case Is Easily Distinguishable**

WBR/WMC contends that the "copying of one chord from the *Chicago Bus Stop* musical composition is de minimis." In support of that argument, WBR/WMC cites to *Newton v. Diamond*, 388 F.3d

1189, 1193 (9th Cir. 2003). However, *Newton* is distinguishable and does not stand for the proposition advanced by WBR/WMC. For starters, page 1193 of the *Newton* opinion does not state that the copying of one chord is *per se* de minimis. That language is simply not there.[15]

It should also be noted that the *Newton* case was not a copyright infringement case involving a <u>sound recording</u>; rather, at issue in *Newton* was a copyright infringement claim only with respect to a <u>composition</u>. *Newton* at 1193. In *Newton*, the plaintiff admittedly licensed the sound recording to the defendants and was only suing on the composition (which had not been licensed). *Id.* Since WBR/WMC only claim to hold a copyright interest in the <u>sound recording</u> for *Vogue*, it is unclear why they are even citing to *Newton*.

---

[15] Furthermore, contrary to WBR/WMG's suggestion, the *Swirsky* case also does not hold that a single chord is "too small a unit to attack copyright protection." Rather, the *Swirsky* case stated that **"a single musical note"** (and not a chord) "would be too small a unit to attract copyright protection." *Swirsky* at 851–852. But the *Swirsky* Court was quick to explain that **a few notes may qualify for copyright protection** and cited to *Elsmere Music, Inc. v. Nat'l Broad. Co.*, 482 F.Supp. 741, 744 (S.D.N.Y. 1980) [finding that four notes were substantial enough to be protected by copyright] and *Santrayll v. Burrell*, 1996 U.S. Dist. LEXIS 3538, at *2 [finding that the repetition of the word "uh-oh" four times in a distinctive rhythm for one measure is sufficiently original to render it protectable under the copyright laws]. *Swirsky* also held that it "cannot be said as a matter of law that seven notes is too short a length to garner copyright protection." *Swirsky* at 852.

16

*Newton* is further distinguishable because plaintiff's expert witnesses failed to rebut defendants' expert as to whether the sampled section was a qualitatively significant portion of plaintiff's composition as a whole. *Id.* at 1196.

Unlike the situation in *Newton*, Plaintiff's expert witness (Dr. Stewart) submitted detailed expert reports that indicate that the horn sample is a qualitatively significant portion to the composition of *Chicago Bus Stop*. (AUMF No. 5). Furthermore, the horn sample sequence at issue in *Chicago Bus Stop* appears throughout *Chicago Bus Stop* (unlike the situation in *Newton*, where it only appeared once). *Newton* at 1195. Finally, *Newton* was decided **before** the Ninth Circuit decided the *Swirsky* case, which placed an emphasis on expert opinion testimony in a music copyright infringement case (as discussed further below).

G.   The "*De Minimis*" Affirmative Defense

WBR/WMC cannot avail themselves of this defense. Even if relatively small, the portion of the pre-existing work that is copied is *substantial if it is of importance to the pre-existing work*. *Williams v. Broadus,* 2001 U.S. Dist. LEXIS 12894 at *14; *Jarvis v. A&M Records,* 827 F. Supp. 282, 290-1 (D. N.J. 1993); *Tin Pan Apple* at *10-13; *ZZ Top v. Chrysler,* 54 F. Supp.2d 983, 984-86 (W.D. Wa. 1999); 4 Nimmer on Copyright, § 13.03[A][2][a]. In this case, as discussed above, Dr. Stewart has explained in great detail why the horn sample is important and substantial to

17

*Chicago Bus Stop*.  WBR/WMC does not coherently address this issue when discussing "*de minimis*" copying.

WBR/WMC also claim that the amount of material taken from *Chicago Bus Stop* is so insignificant that it is not actionable. However, Dr. Stewart opines that the sampled horn parts appear in *Vogue* for a much longer duration than WBR/WMC implies. Dr. Stewart lays out a detailed substantive basis to support his conclusion that the sampled horn is quantitatively and qualitatively significant to both the composition and sound recording to *Chicago Bus Stop*.

WBR/WMC again relies on the case of *Newton* for their argument that a small use, even in a music sampling case, is effectively forgivable.  However, it was the composition, not the sound recording that was at issue.  Thus, *Newton* does **not** stand for the proposition that one can sample a sound recording and escape liability so long as too much is not taken. Where, as here, there is evidence that a defendant literally sampled/copied, there is no legal precedent to support that such a taking can be legally forgiven.  The sampled horn part in this case was significant enough that it was sampled into multiple versions of *Vogue*.

As *Newton* instructs us the relevant inquiry is whether the horn parts are significant to *Chicago Bus Stop*.  Dr. Stewart had made it clear that the horn parts are quantitatively and

18

qualitatively important to *Chicago Bus Stop.* It bears repeating that *Chicago Bus Stop* is essentially an instrumental piece, which further highlights the significance of the live horn part that repeats throughout that song.

**V.   WHETHER *LOVE BREAK* IS A DERIVATIVE WORK AND WHETHER KEN CAYRE'S DECLARATION SHOULD BE STRICKEN IS A RED HERRING**

In its moving papers, WBM/WMG spends a considerable amount of time arguing that Plaintiff never registered a copyright for *Love Break* and therefore, it cannot bring a copyright infringement action with respect to original elements of *Love Break*.  This argument has no bearing on what Plaintiff is actually suing over – which is the original horn hits contained in *Chicago Bus Stop* and later used in *Vogue.* Therefore, whether or not *Love Break* is a derivative work is really a non-issue because Plaintiff is not suing over any new copyrightable elements contained within *Love Break*.   Similarly, defendants' focus on whether *Love Break* is a "work for hire" is also irrelevant.  However, to the extent that the Court believes this is important, then Plaintiff has submitted evidence that *Love Break* was a indeed a "work for hire" under a written agreement as explained in Ken Cayre's declaration.  Whether or not *Love Break* was a "work for hire" is usually for a jury to decide, since the evidence of intent of the parties is relevant for a work-made-for-hire determination.  *Twentieth Century Fox v. Entn't Distrib.*, 429 F.3d 869, 881-82 (9th Cir. 2005); *see also*

*Self-Realization Fellowship Church v. Ananda Church*, 206 F.3d 1322, 1328 (9th Cir. 2000)

WBR/WMG also attempts to have the Court strike Mr. Cayre's entire declaration because he was not disclosed in Plaintiff's initial disclosures. That is a drastic request and is not warranted here. The circumstances establishing Defendants' knowledge of the involvement of Mr. Cayre are set forth in the Supplemental Declaration of Robert S. Besser.  Mr. Pettibone's personal lawyer (Mark A. Levinsohn, Esq.) represented Plaintiff's parent company in its due diligence surrounding Plaintiff's acquisition of the composition and sound recording involved in this action and thus was well aware of Mr. Cayre. Over the objection of Plaintiff's counsel, Mr. Levinsohn has actively participated, though never formally appearing as counsel of record, in many of the depositions taken in this action.  On April 2, 2013, Mr. Busch, who has assumed the lead role for Defendants, showed Mr. Besser a declaration that he had secured from Mr. Glenn Larusso, Mr. Cayre's subordinate, but refused to give Mr. Besser a copy of the Declaration on the grounds that it was protected as attorney work product. Two weeks later Mr. Busch elicited substantial testimony from Mr. Curt Frasca about the role of Mr. Cayre both as the head of the seller and the person who had hired Mr. Pettibone in 1982 to remix Chicago Bus Stop.  Thereafter, Defendants filed their

first Motion for Summary Judgment and relied in part on the

Declaration of Glenn Larusso.  At this point, it became apparent

that Mr. Cayre might be able to provide rebuttal testimony. (*See*

Supp Besser Dec. ¶8). Furthermore, at no point in time did

counsel for WBR/WMG or the other defendants attempt to notice

Mr. Cayre's deposition. Supp. Besser Dec. ¶9.  This inaction by

Defendants along with their full knowledge of Mr. Cayre's

involvement establishes that the non-disclosure of Ken Cayre in

the initial disclosures was  "harmless."  *See Goodman v. Staples*

*The Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011).

**VI.   PLAINTIFF IS ENTITLED TO SEEK DEFENDANTS' PROFITS[16]**

     The last argument made by WBR/WMC is that Plaintiff is not

entitled to recover any of defendants' profits.  However, that

is not the case.  WBR/WMC completely confuse the profits

standard when they attempt to argue that it is the Plaintiff's

burden to show that consumers purchased *Vogue* because of the

---

[16] In the present case, the parties have "met and conferred" extensively regarding defendants' refusal to provide any "profits" discovery. Similarly, the depositions of Plaintiff's damages expert (Dr. Michael Einhorn) and defendants' expert (Jason King), have been "tabled" until such information is provided.  Based upon the applicable legal standards, if defendants continue to refuse to provide the requested discovery, motions *in limine* to exclude the information at trial may be made; however, it is counsel's good faith belief that once the Court denies the motions for summary judgment, the damage information shall be provided and financial discovery (of experts and otherwise) will be completed. Supp. Besser Dec. ¶10; *see also* **Exhibit "M"** (attaching Dr. Einhorn's expert report)

horn sample in question, and absent such evidence, no profits can be awarded as a matter of law. There is a significant legal distinction in copyright law between direct profits and indirect profits that is tossed aside in WBR/WMC's proffered argument. The direct profits cases allow for the recovery of profits when an infringing good is actually sold. For example, all record sales that include the sampled horn involve a claim for direct profits. In that situation, the plaintiff need only show the gross revenues obtained from the sale of product that contained the sample.  This standard is expressly set forth in 17 U.S.C. §504(b) of the Copyright Act, which is appropriately cited as the controlling statutory authority on copyright damages by WBR/WMC; however, WBR/WMC have omitted from their citation a controlling portion of the statute: "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." "On its face §504(b) does not differentiate between 'direct profits' -- those that are generated by selling an infringing product -- and 'indirect profits' -- revenue that has a more attenuated nexus to the infringement. Nor does it discuss whether tort principles, such as causation, should play a role in determining whether the infringer's profit's were a

result of the infringing act. Nevertheless, in our prior decisions, we have held that a copyright holder must establish the existence of a causal link before **indirect** profits damages can be recovered." *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002). The purpose of the award of defendant's profits is "to prevent the infringer from unfairly benefiting from a wrongful act." *See In Re Independent Serv. Orgs. Antitrust Litig.*, 23 F. Supp. 2d 1242, 1250 (D. Kan. 1998). Where there is a commingling of gains, it is the burden of the copyright infringer to prove the separation of the profits and what portion of total profits is attributable to non-infringing elements. *Sheldon v. Metro-Goldwyn Pictures*, 309 U.S. 390, 406 (1940). If infringed portions are so suffused and intertwined with non-infringing portions as to render an apportionment impossible no apportionment is appropriate. *Business Trends Analysts v. Freedonia*, 887 F.2d 399, 407 (2d Cir. 1989). Any doubt as to the computation of costs or profits is to be resolved in favor of the plaintiff." *Frank Music* at 514.

Conversely, indirect profits, *i.e.*, those profits that do not involve a sale of the infringing work, involve proof of causation before the above gross revenue and burden shifting framework of 17 U.S.C. § 504 (b) is applied. The reason is an obvious one, a claim for indirect profits under 504(b) is "relatively rare." *Id* at 913. *Polar Bear v. Timex*, 384 F.3d 700 (9th Cir. 2004), relied upon heavily by the defendants, is not a

23

direct profits case and focused on the issue of the threshold
required in an indirect profits copyright infringement action.
There, Timex used plaintiff's video in a sales booth. The Court
allowed the plaintiff to recover as actual damages a license fee
that they would have earned, but found their claim that if the
license had been paid, they would have had more money to invest
in their own company and as a result, would have been able to
have earned profits, as too speculative. Likewise, in the
seminal case of *Frank Music* 772 F.2d 505, 517 (9th Cir. 1985),
the defendants incorporated the plaintiff's songs into a musical
performance at a casino venue. Under the direct profits
analysis, the Court appropriately shifted the burden to the
defendants to show what portion of ticket sales to the show that
contained the infringing music was attributable to other factors
other than the infringing work. However, under an indirect
profits analysis, after finding that MGM had indeed infringed
the songs' copyrights, the Court held that the publisher could
recover indirect damages, such as profits from the hotel's
casino, that had been boosted by the show's promotional value
provided that the profits were "ascertainable." Similarly, in
*Mackie v. Rieser, supra,* 296 F.3d 909 (9th Cir. 2002), relied
upon heavily by the *Polar Bear* Court, the plaintiff was only
making a claim to indirect profits resulting from the use of its
artwork on a pamphlet that was sent to solicit symphony ticket
subscriptions; *i.e.,* the pamphlets were not sold.

The danger in WBR/WMC's proffered position is that they are
arguing that legally, there is no difference between a direct
infringement and indirect infringement claim. No copyright case

24

has ever adopted this logic and to do so, would not just re-write the express language of the statute, but all of the copyright authorities citing it. Although all of Defendants' arguments are based upon language derived from decisions that dealt exclusively with the issue of indirect profits versus direct profits, WBR/WMC is not making this distinction in their motion for partial summary judgment and are asking this Court to re-write copyright law by finding as a matter of law that where an issue of fact exists that a recording was sampled, no profits (direct or indirect) are recoverable unless a plaintiff, as opposed to a defendant, somehow presents evidence as to what is actually motivating consumers to purchase the recordings that contain the sampled materials.

The evidence in this case at a minimum creates a triable issue of material fact on whether defendants sampled from Plaintiff's record. Dr. Stewart discussed at length that the sampled portion of the recording is compositionally significant to both *Chicago Bus Stop* and to *Vogue*. Thus, at a minimum, there is ample evidence that at least a portion of the music in *Vogue* derives some benefit from the sampled horn part. Why sample it otherwise? Significantly, although defendants' own expert report from Jason King spends much time minimizing the importance of the horn section that was sampled, he does conclude that at least a small portion of the sales of *Vogue* can be attributed to the sampled materials: "If one were to base the horn hits' value on the percentage of the recording they occupy, their value would be no more than 1%, though I would significantly reduce that percentage by taking into account the other non-

compositional factors that do not occupy time in the recording.
. ." *See*, Exhibit 12-223 to Declaration of Paul H. Duvall filed
in connection with Shep Pettibone's Reply to Opposition to
Motion for Summary Judgment.

In utilizing defendant's own expert analysis, the inquiry
at trial will be how much of the sales of the records are
attributable to the horn sample. The law clearly places that
burden upon the **defendant** once plaintiff makes a claim for
direct profits by showing that the defendants sold product that
included a portion of their recording. *See, generally*, the gross
revenue analysis submitted by Plaintiff's Expert Michael
Einhorn, and attached as **Exhibit "M"** to the Supp. Besser Decl.
It is ultimately for the trier of fact to choose who to believe;
Dr. Stewart and his analysis that the sampled horn part is an
important part of Vogue, or defendants' expert that defendants
should be limited to around 1% of the profits.

**VI.   CONCLUSION**

For all of the aforementioned reasons, WBR/WMG's
"supplemental memorandum in support of joinder" and "alternative
motion for partial summary judgment" should be denied.

Dated:  August 12, 2013          Respectfully submitted,

                                 LAW OFFICES OF ROBERT S. BESSER

                                 By: /s/ Robert S. Besser
                                 _____
                                 ROBERT S. BESSER
                                 Attorneys for Plaintiff